UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ANTHONY STONE, *et al.*,

                              Plaintiffs,

        -against-                                     7:15-cv-0097 (LEK/ATB)

OFFICER JASON WHITE, *et al.*,

                              Defendants.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

       Plaintiffs Anthony Stone ("Stone") and Jaclyn Watson ("Watson") (collectively "Plaintiffs")

filed this civil rights action alleging that Defendants[1] violated their rights under the First and

Fourteenth Amendments based on their status as an interracial couple while Stone was incarcerated

at Cape Vincent Correctional Facility ("Cape Vincent C.F."). Dkt. Nos. 1 ("Complaint"); 4

("Amended Complaint"). Presently before the Court is Defendants' Motion to dismiss the

Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure

12(b)(6). Dkt Nos. 32 ("Motion"); 32-1 ("Memorandum"). Plaintiffs filed a Response in

Opposition and Defendants filed a Reply. Dkt. Nos. 35 ("Response"); 40 ("Reply"). For the

following reasons, Defendants' Motion is granted in part and denied in part.

_____

     [1] Plaintiffs have named as Defendants the New York State Department of Corrections and Community Supervision ("DOCCS"), former DOCCS Commissioner Brian Fischer, Cape Vincent Correctional Facility ("Cape Vincent C.F."), Officer Jason White, Officer Eamer, Officer Martin, Officer Black, Sergeant Ernest Mustizer, Captain Jeremy Knapp, Deputy Superintendent Brian McAuliffe, Sergeant Matthew Grant, Officer Norman Kirkland, Officer Pratt, Marc Miller, Lieutenant Robynn Graves, Lieutenant Norman Jones, and John Doe(s) and Jane Doe(s).

## II.    BACKGROUND[2]

Stone is an African-American male who was incarcerated at Cape Vincent C.F. beginning on

January 26, 2012.  Am. Compl. ¶¶ 6, 24.  Watson is a white female and the fiancée of Stone.  Id.

¶ 7.  Watson visited Stone at Cape Vincent weekly and Plaintiffs allege that on or about January 28,

2012, they were harassed and mistreated by Defendants on account of their status as an interracial

couple.  Id. ¶¶ 25-26.

### A. Discrimination Against Watson

Plaintiffs allege that on several instances, Stone was called a "n***er" by Defendants and

Watson was called a "n***er lover."  Id. ¶ 28.  On one occasion, an officer asked Watson, "[y]ou

can have anyone you want.  Why be with someone who's ghetto?"  Id. ¶ 29.  Watson also alleges

that she was regularly subjected to invasive searches of her person while individuals who were not

in interracial relationships were not placed under such scrutiny.  Id. ¶ 39.  Watson was frequently

selected by the officers to receive drug screenings, a practice that only began after she complained to

the Superintendent and the Department of Corrections in Albany.  Id.

After a search, Watson was told to hold her bra and was not allowed to put it back on despite

her repeated requests.  Id. ¶ 40.  An officer suggested that he would "like to help her with that" and

put Watson's bra on for her.  Id.  Defendant Mustizer entered the room and asked why Watson was

holding her bra; he allowed Watson to put her bra back on but did not reprimand the officers

---

[2] Because this matter is before the Court on a motion to dismiss, the allegations of the
Complaint are accepted as true and form the basis of this section.  See Boyd v. Nationwide Mut. Ins.
Co., 208 F.3d 406, 408 (2d Cir. 2000); see also Matson v. Bd. of Educ., 631 F.3d 57, 72 (2d Cir.
2011) (noting that, in addressing a motion to dismiss, a court must view a plaintiff's factual
allegations "in a light most favorable to the plaintiff and draw[] all reasonable inferences in her
favor").

responsible.  Id.  When Watson complained about the incident, she was told "[s]tay with your own kind, and this wouldn't happen."  Id. ¶ 41.

On another occasion, Defendant White told Watson "pull your dress up over your stomach and chest.  Pull your dress up or I'm ending your visit."  Id. ¶ 31.  Plaintiff contends that she could not do that, because her dress was short enough that pulling it up would reveal her thighs.  Id.  Soon after, Defendant Grant arrived and Watson asked to speak to him about the incident with Defendant White.  Id.  Defendant Grant stated that Watson "was a beautiful woman with a nice body," and that because of Watson's "curves," she was going to have "these problems with these officers" because they "do not like that [she] deals with a black guy."  Id.

**B. Discrimination Against Watson and Stone as an Interracial Couple**

Visitors and inmates at Cape Vincent C.F. are allowed to have their pictures taken if they purchase a token, which can be redeemed for one picture.  Id. ¶ 33.  Plaintiffs purchased a token, but Defendant Kirkland refused to allow them to take a picture and told them, in reference to the token, "I should make you f***ing eat it."  Id. ¶ 33.

Plaintiffs allege that they were frequently treated differently than non-interracial couples. While non-interracial couples were allowed to kiss and hug during their visitation periods, Plaintiffs were told that they were allowed to kiss and hug once at the beginning of the visitation and once at the end.  Id. ¶ 30.  On another occasion, Defendant Eamer saw Watson with her hand on Stone's arm during a visit.  Id. ¶ 32.  He told Plaintiffs "[o]n my watch, you don't touch her."  Id. Meanwhile, non inter-racial couples were embracing and kissing during their visitations.  Id.

In the visitors area, there is a red line that inmates are not allowed to cross; however, a microwave is located on the forbidden side of the red line and inmates are regularly permitted to use

3

it.  Id. ¶ 34.  Defendant Black told Plaintiffs they could not use the microwave because it was over

the line.  Id.  Meanwhile, a non-interracial couple was kissing while standing on the other side of the

red line.  Id.  Stone approached Defendant Black for clarification, and he responded "[d]on't talk to

me.  I said stay behind the red line."  Id. ¶ 35.  Stone then approached another officer for

clarification, at which point Defendant Black told Stone "[h]ey f***er.  Yeah you f***er.  Come

over here.  Why you talking [to the other officer]?  Just like your kind, daddy tells you one thing,

you gotta run to mommy.  I could send you to Canada, then see how you can see her then."  Id. ¶ 36.

Defendant Black later told Stone that he was going to "fix" him.  Id. ¶ 37.

On another occasion, Defendant Black told Plaintiffs to sit at a table where there was a cloud

of gnats flying around some food.  Id. ¶ 38.  When Watson asked to be moved to a different table,

Defendant Black stated "where I sit you is where I sit you.  If you don't like it, don't come here.

File a grievance, see how far that gets you."  Id.

## C.  Search of Stone's Cube

On October 28, 2012, Plaintiffs each wrote letters to the Commissioner of the Department of

Corrections and Community Supervision ("DOCCS") complaining of harassment and mistreatment.

Id. ¶ 42.  In November 2012, Stone alleges that he was denied medical care and ended up fainting.

Id. ¶ 43.  Plaintiffs complained to Cape Vincent C.F., and soon after, a cube search was conducted

on Stone.  Id.  During the search, several personal items that were not contraband were removed

from Stone's cube and never returned.  Id.  When Stone asked why these items were removed, the

searching officer informed him that she was instructed to remove them by her superiors.  Id.

Plaintiffs again sent letters complaining of their treatment at the hands of Defendants to the

Commissioner of DOCCS and to Dr. Carl Koenigsmann, Deputy Commissioner and Chief Medical

Officer.  Id. ¶ 44.  Watson also faxed a letter to the Inspector General's office on November 21, 2012.  Id.  On December 20, 2012, Stone received a letter informing him that Cape Vincent C.F. had been notified of his complaint.  Id. ¶ 45.

On December 11, 2012, Defendant Jones interviewed Stone regarding the letter he sent on November 21, 2012.  Id. ¶ 46.  Stone informed Jones that he was fearful of retaliation, and Defendant Jones assured him that there would be no retaliation.  Id.  Defendant Jones informed Stone that the conversation was being recorded and Stone observed Jones push "record" on the audio recorder.  Id.  Stone discussed "all matters of harassment" with Defendant Jones and later discussed the details of the meeting during a phone call with Watson, which was also recorded.  Id.

At approximately 6:00 pm on December 11, Stone's cube was searched by Defendant Officers Pratt and Martin.  Id. ¶ 47.  During the search, Stone observed Defendant Martin take an object out of his pocket and drop it to the floor.  Id. ¶ 48.  Defendant Martin then claimed that the object had fallen from one of Stone's possessions and revealed that it was a packet of drugs.  Id. ¶¶ 48-49.  Other inmates witnessed Defendant Martin plant the drugs and one inmate relayed the information to his wife, who contacted Watson.  Id. ¶ 50.  Plaintiffs allege that this inmate was disciplined shortly thereafter.  Id.

Watson contacted Defendants Knapp and McAuliffe and asked them to review the recording of Stone's conversation with Defendant Jones.  Id. ¶ 51.  She also asked them to interview the inmates who witnessed the search of Stone's cell, but did not receive a response.  Id.  Watson was later asked to take books from Stone's cube.  Id. ¶ 52.  When she went to retrieve them, she was confronted by Defendant Graves, who stated "I don't do well with visitors who accuse my officers who work with great integrity of doing things that they don't do and I do not deal well with inmates

who lie on my officers and say that they did things that they did not do. They will be dealt with accordingly." Id. Watson perceived Defendant Graves to be "very threatening and hostile" toward her during this conversation. Id.

As a result of the cube search, Stone was charged with a Tier III charge. Id. ¶ 53. A hearing was held in response to the charge, but Stone was not permitted to call witnesses or present evidence to support his defense that the drugs had been planted in his cell. Id. Stone requested that Defendant Jones produce the recording of their previous conversation, but Defendant Jones denied that any such recording existed. Id. Stone was then placed in the special housing unit ("SHU") for ninety one days. Id. ¶ 54. He was not allowed to have any visitors, access to a phone, receive packages, and it was recommended that he lose his good time credits. Id. Stone was required to take an alcohol and substance abuse training program ("ASAT") and his placement in SHU also prevented him from completing his bachelor's degree program. Id. Watson alleges that she was not permitted to visit Stone while he was in SHU and that she later learned there was no legal basis or justification to deny her access to her fiancé. Id. ¶ 55. Plaintiffs contend that they continued to open grievances against Cape Vincent C.F. and mail and fax letters to the DOCCS Commissioner's office and the Inspector General's office, but they never received responses. Id. ¶ 56.

On March 12, 2013, Stone was released from SHU and transferred to a medium security facility outside of Watertown. Id. ¶ 57. On May 21, 2014, the Inspector General's office removed Stone from ASAT and restored his loss of good time, which allowed Stone to be released on July 2, 2014. Id. ¶ 59.

As a result of Defendants' actions, Plaintiffs allege that they suffer from numerous physical and psychological ailments, including severe emotional distress and anxiety, sleeplessness,

headaches, and stomach aches.  Id. ¶ 60.  Plaintiffs also have incurred reputational damage,

humiliation, indignity, and shame.  Id.  Plaintiffs assert the following causes of action: (1) race

discrimination on behalf of Stone and Watson in violation of 42 U.S.C. §§ 1981, 1983, and the

Fourteenth Amendment; (2) gender discrimination on behalf of Watson in violation of 42 U.S.C.

§ 1983 and the Fourteenth Amendment; (3) retaliation in violation of 42 U.S.C. §§ 1981 and 1983

and the First Amendment on behalf of both Plaintiffs; (4) sexual harassment on behalf of Watson in

violation of 42 U.S.C. § 1983; (5) violation of Stone's due process rights pursuant to 42 U.S.C.

§ 1983 and the Fourteenth Amendment; (6) conspiracy to deprive Plaintiffs of their constitutional

rights and to retaliate against them for engaging in their constitutional rights pursuant to 42 U.S.C.

§ 1983; (7) violation of Plaintiffs' rights under Article I of the New York State Constitution; and (8)

violation of Plaintiffs' rights under Title VII of the Civil Rights Act of 1964.  See Am. Compl.

## III.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also FED. R. CIV. P. 12(b)(6).  A court must

accept as true the factual allegations contained in a complaint and draw all inferences in favor of a

plaintiff.  See Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006).  A complaint may be

dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a

claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.  Plausibility requires

"enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged

misconduct]."  Id. at 556.  The plausibility standard "asks for more than a sheer possibility that a

defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  "[T]he

pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands

more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Id. (citing Twombly,

550 U.S. at 555).  Where a court is unable to infer more than the mere possibility of the alleged

misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief

and the action is subject to dismissal.  See id. at 678-79.

## IV.    DISCUSSION

As a preliminary matter, the Court notes that the Amended Complaint does not specify

which claims apply to which Defendants.  Accordingly, the Court has interpreted the allegations in

the Complaint in the light more favorable to Plaintiffs and evaluated the claims asserted against all

Defendants.

### A. Sovereign Immunity

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not

be construed to extend to any suit in law or equity, commenced or prosecuted against one of the

United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S.

CONST. amend. XI.  "The ultimate guarantee of the Eleventh Amendment is that nonconsenting

States may not be sued by private individuals in federal court."  Bd. of Trs. of Univ. of Ala. v.

Garrett, 531 U.S. 356, 363 (2001).  The Supreme Court has held that the Eleventh Amendment also

bars suits against a state brought by its own citizens.  Hans v. Louisiana, 134 U.S. 1 (1890).  "The

Eleventh Amendment bar to suit in federal courts extends not only to the state itself but also to any

entity that is deemed to be an arm of the State."  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,

429 U.S. 274, 280 (1977); see also Pennhurst State Sch. & Hosp., 465 U.S. at 100 ("It is clear, of

8

course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.").

Eleventh Amendment immunity is not absolute: a state "may consent to suit in federal court and, in certain cases, Congress may abrogate the States' sovereign immunity." Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990). It is well established that § 1983 does not abrogate a state's Eleventh Amendment immunity without its consent. Will v. Mich. Dep't of State Police, 491 U.S. 58, 67 (1989); Komlosi v. N.Y. State Office of Mental Retardation & Developmental Disabilities, 64 F.3d 810, 815 (2d Cir. 1995). It is equally well established that New York state has not waived its right to sovereign immunity for actions brought under § 1983. Goonewardena v. New York, 475 F. Supp. 2d 310, 329 (S.D.N.Y. 2007). Similarly, New York State has not waived its sovereign immunity for actions brought under § 1981, nor has Congress abrogated states' immunity for such actions. Jackson v. Battaglia, 63 F. Supp. 3d 214, 220 (N.D.N.Y. 2014). Accordingly, Plaintiffs' § 1981 and § 1983 claims against DOCCS and Cape Vincent C.F. are barred under the Eleventh Amendment.

To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." Rourke v. N. Y. State Dep't of Corr. Servs., 915 F. Supp. 525, 539 (N.D.N.Y. 1995); see also Mathie v. Fries, 121 F.3d 808, 818 (2d Cir. 1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer . . . .").

Plaintiffs' claims for damages against the individual Defendants in their official capacities are barred under the Eleventh Amendment. However, under Ex parte Young, 209 U.S. 123 (1908),

9

"acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." Berman Enters., Inc. v. Jorling, 3 F.3d 602, 606 (2d Cir. 1993). Accordingly, Plaintiffs' claims for injunctive relief against the individual Defendants may proceed under the theory of Ex Parte Young.

**B. 42 U.S.C. § 1981**

Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981. In order to state a claim under § 1981, a plaintiff must allege the following: (1) that he or she is a member of a racial minority; (2) that the defendant intended to discriminate the plaintiff on the basis of race; (3) that the discrimination concerned one or more of the activities enumerated in § 1981. Broich v. Inc. Vill. of Southampton, 462 F. App'x 39, 42 (2d Cir. 2012). To establish the second element of a § 1981 claim, a plaintiff's claim must meet "the same burden-shifting analysis as intentional discrimination claims brought under Title VII of the Civil Rights Act of 1964" as set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Broich, 462 F. App'x at 42.

*1. Watson*

Defendant argues that Watson's § 1981 claim must fail because she is not a member of a racial minority group and therefore not entitled to the protections of § 1981. Mem. at 8.[3] Under § 1981, a plaintiff does not have to be a member of a racial minority to bring a claim; rather, a non-minority plaintiff can allege personal injury stemming from a defendant's discriminatory conduct

---

[3] Citations to the parties' briefs refer to the pagination used by the parties.

against a racial minority.  See Robledo v. Bond No. 9, 965 F. Supp. 2d 470, 476 (S.D.N.Y. 2013) (denying motion to dismiss where a white plaintiff alleged that she protested defendant's verbal abuse against a racial minority); see also Rosenblatt v. Bivone & Cohen, P.C., 946 F. Supp. 298, 301 (S.D.N.Y. 1996) (finding that white plaintiff had standing under § 1981 where he alleges that he had been discriminated against on account of his marriage to a black woman).  In the present case, Watson alleges that she protested Defendants' discrimination against Stone, a black man, and Defendants' discrimination of Stone and Watson as an interracial couple.  "It is well-settled that a claim of discrimination based on an interracial relationship or association is cognizable under Section 1981."  Rosenblatt, 946 F. Supp. at 301.  Accordingly, Defendants' argument that Watson lacks standing under § 1981 is without merit.[4]

### 2. Stone

Defendants argue that Stone has failed to state a prima facie case under § 1981 because he fails to allege that Defendants have deprived him of the right to make and enforce contracts or that Defendants have denied him the equal benefit of a law for the security of persons or property ("equal benefit clause").  Mem. at 8-9.  Plaintiffs concede that they do not seek to enforce their rights to make or enforce contracts but argue that their § 1981 claims can proceed under the equal benefit clause.  Resp. at 9-11.

Under the equal benefit clause, a violation of § 1981 may be found when a "private individual injures 'the security of persons and property' in violation of a state law, and does so with a racially discriminatory purpose."  Wong v. Mangone, 450 F. App'x 27, 30 (2d Cir. 2011) (finding

---

[4] The scope of Watson's § 1981 claim will be further narrowed, consistent with the Court's discussion of Stone's § 1981 claim, discussed *infra*.

that plaintiff produced enough evidence for a reasonable fact-finder to find that defendant violated

New York State laws prohibiting assault and battery, which are clearly intended to protect the

security of persons and property); see also Martin v. J.C. Penney Corp., 28 F. Supp. 3d 153, 157

(E.D.N.Y. 2014) (finding that allegations of assault, battery, and false imprisonment fell "within the

ambit of 'laws or proceedings for the security of persons and property' protected by 1981's equal

benefit clause").  In Tchatat v. City of New York, the court granted plaintiff's motion for

reconsideration, finding that plaintiff pleaded a colorable claim under § 1981 where the plaintiff

alleged that defendants conspired to violate his "right to equal protection of the laws because of his

race."  No. 14 Civ. 2385, 2015 WL 6159320, at *2-3 (S.D.N.Y. Oct. 30, 2015).  Similar to Tchatat,

Stone's equal protection claim may serve as the basis for his § 1981 claim under the equal benefit

clause. Accordingly, the Court finds that Stone's § 1981 claim may proceed to the extent that he has

stated a valid equal protection claim, discussed *infra*.

### C.  42 U.S.C. § 1983 Claims

42 U.S.C. § 1983 provides "a private right of action against any person who, acting under

the color of state law, causes another person to be subjected to the deprivation" of a right, privilege,

or immunity secured by the Constitution or laws of the United States.  Blyden v. Mancusi, 186 F.3d

252, 264 (2d Cir. 1999).  "Section 1983 itself creates no substantive rights, [but] only a procedure

for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519

(2d Cir. 1993).

A valid claim under § 1983 requires a showing of personal involvement by the defendant in

the alleged constitutional deprivation.  Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  In § 1983

actions, the doctrine of respondeat superior is unavailable.  Polk County v. Dodson, 454 U.S. 312,

325 (1981). In the Amended Complaint, Plaintiffs make no factual allegations against Defendant Marc Miller and therefore they fail to show that Defendant Miller was personally involved in any alleged constitutional deprivation. Accordingly, all claims against Defendant Miller are dismissed.

### 1. First Amendment Right of Free Association

The Supreme Court has determined that a prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). "An inmate does not retain rights inconsistent with proper incarceration," and freedom of association "is among the rights least compatible with incarceration." Overton v. Bazzetta, 539 U.S. 126, 131 (2003). "The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.'" Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir. 1995) (quoting Turner v. Safley, 482 U.S. 78, 84 (1987)). "[T]his deferential standard applies notwithstanding that this case implicates the rights of non-inmates as well as those of a prisoner." Hernandez v. McGinnis, 272 F. Supp. 2d 223, 226 (W.D.N.Y. 2003).

Prison officials are entitled to impose measures reasonably calculated to preserve the safety and security of a prison facility and its employees and inmates, even though such measures may impinge upon an inmate's ability to speak freely or to associate with others. See Auleta v. LaFrance, 233 F. Supp. 2d 396, 399 (N.D.N.Y. 2002) (Kahn, J.) (noting that restrictions on inmate communication are constitutional if reasonably related to legitimate penological interests). However, "prison officials may not deter the right of a prison inmate to voice complaints regarding prison conditions through established processes by taking adverse actions which are intended, or

which have the affect, of chilling or abridging such rights." Esclara v. Charwand, No. 04-CV-0983, 2008 WL 699273, at *6 (N.D.N.Y. Mar. 12, 2008).

Plaintiffs do not specifically identify which factual allegations support their free association claim, instead grouping their free association claim with their equal protection claim. Although Plaintiffs mention specific prison regulations such as not allowing inmates to cross the red line to access the microwave, or restrictions on when inmates and visitors are allowed to embrace during a visit, Plaintiffs seem to challenge the way in which these regulations were applied to them, rather than the validity of those regulations themselves. Therefore, Plaintiffs' claims are more appropriately addressed under the Equal Protection Clause, discussed *infra*, rather than the First Amendment.

In their Opposition, Plaintiffs cite Stone's placement in SHU as an example of how Defendants deprived Plaintiffs of their right to freely associate. Am. Compl. ¶ 55. Plaintiffs allege that while Stone was placed in SHU, Watson was informed that she was not allowed to visit him. Id. It is well established that prison visitation is a privilege, and not a right, and that limiting visitation temporarily in response to a disciplinary action is appropriate. Midalao v. Bass, No. 03-CV-1128, 2006 WL 2795332, at *16-17 (N.D.N.Y. Sept. 26, 2006) (finding that family visitations for inmates only constitute a privilege and not a right); Hernandez, 272 F. Supp.2d at 227 (finding three-year revocation of inmate's visitation privileges following disciplinary hearing did not violate First Amendment). Accordingly, the Court finds Plaintiffs' allegation that Watson was informed she could not visit Stone during his temporary placement in SHU insufficient to state a claim under the First Amendment; therefore, Plaintiffs' First Amendment freedom of association claim is dismissed.

## 2. Fourteenth Amendment Right to Equal Protection–Interracial Couple

The Equal Protection Clause "essentially mandates that all similarly situated persons be treated alike." Myers v. Barrett, No. 95-CV-1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997). The Equal Protection Clause prohibits the unequal enforcement of even valid laws where the enforcement results from an improper motive. Yick Wo v. Hopkins, 118 U.S. 356 (1886). In order to establish an equal protection violation, Plaintiffs must show that they were treated differently than other similarly situated individuals and that such unequal treatment was the result of intentional and purposeful discrimination. Myers, 1997 WL 151770, at *3.

Plaintiffs claim that they were treated differently than other couples at Cape Vincent C.F. on account of their interracial status. Am. Compl. ¶¶ 25-26. Defendants argue that Myers is dispositive of Plaintiffs' claims. Mem. at 12-13; Myers, 1997 WL 151770, at *3-4. In Myers, the court dismissed the plaintiffs' claim that defendants deprived them of equal protection during visitation at a prison based on their status as an interracial couple. Myers, 1997 WL 151770, at *3-4. There, the court found that the plaintiffs failed to cite any instances where other couples in their situation were treated differently. Id. at *4. Additionally, the court found that the plaintiffs failed to allege sufficient personal involvement of the individual defendants. Id.

Unlike the plaintiffs in Myers, the Court finds that Plaintiffs have stated numerous instances in which they were treated differently than other non-interracial couples during visitations at Cape Vincent C.F. Watson alleges that she was regularly subjected to invasive bodily searches that individuals who were not in interracial relationships were not subjected to. Am. Compl. ¶ 39. Additionally, Plaintiffs allege that visitors and inmates at Cape Vincent C.F. are allowed to have their pictures taken if they purchase a token, but Defendant Kirkland refused to allow Plaintiffs to

take their picture after they had purchased a token.  Id. ¶ 33.  Plaintiffs claim that non-interracial couples were allowed to kiss and hug throughout their visitations, but Plaintiffs were only allowed to kiss and hug once at the beginning and once at the end of their visits.  Id. ¶ 30.  When Defendant Eamer saw Watson with her hand on Stone's arm he told her that she was not allowed to touch him "on [his] watch."  Id. ¶ 32.  Plaintiffs also allege that Defendant Black refused to allow them to use a microwave that was across a line that inmates were not allowed to cross, even though other people were routinely allowed to cross the line to use the microwave.  Id. ¶ 34.  Plaintiffs allege that at the same time they were told that they could not use the microwave, a non-interracial couple was standing on the other side of the line kissing.  Id.  When Plaintiffs complained about this, Defendant Black responded by making a comment about Stone's "kind" and threatened to send him to Canada. Id. ¶¶ 35-37.  The Court finds that these allegations are sufficient to allege that Plaintiffs were treated differently than other similarly situated individuals and that such unequal treatment was the result of intentional and purposeful discrimination by Defendants based on Plaintiffs' status as an interracial couple.

While Defendants are correct that verbal harassment and racially derogatory remarks, without more, are not actionable under § 1983, Mem. at 11, the Court finds that the aforementioned incidents involve not only verbal harassment, but also the deprivation of access to privileges that Plaintiffs allege were available to non-interracial couples.  See Johnson v. Eggersdorf, 8 F. App'x 140, 143 (2d Cir. 2001) (finding allegations of verbal harassment alone are not actionable under § 1983); see also King v. City of Eastpointe, 86 F. App'x 790, 814 (6th Cir. 2003) ("The use of racially discriminatory language can provide some evidence of a discriminatory purpose when that language is coupled with some additional harassment or constitutional violation.").

Since Plaintiffs generally assert their equal protection claim against all Defendants, the Court must determine which Defendants were "personally involved" in the conduct giving rise to Plaintiffs' equal protection claim. Wright, 21 F.3d at 501. Defendants Black, Eamer, and Kirkland are the only Defendants specifically mentioned in the allegations giving rise to Plaintiff's equal protection claim. Accordingly, Plaintiffs' equal protection claim against all Defendants other than Black, Eamer, and Kirkland are dismissed for failure to allege personal involvement.[5]

### 3. *Fourteenth Amendment Right to Equal Protection–Gender*

Watson alleges that she was denied equal protection by Defendants based on her gender. Opp'n at 15. Defendants argue that Watson's claims resound in race discrimination, and that "[n]owhere does she claim she was denied visits, or to hug and kiss Stone during visits, because she is female." Mem. at 13. To make out a claim for gender discrimination under the Equal Protection Clause, a plaintiff must allege that she suffered purposeful or intentional discrimination on the basis of gender. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977). When evaluating a discrimination claim based on a particular characteristic, the "*sine qua non*" of a discrimination claim is that "the discrimination must be because of [a protected characteristic]." Patane v. Clark, 508 F. 3d 106, 112 (2d Cir. 2007); see also Acosta v. City of New York, No. 11 Civ. 856, 2015 WL 1506954, at *4 (S.D.N.Y. Apr. 26, 2012) ("[T]he sine qua non of a race-based discrimination or retaliation claim is that discrimination or retaliation was because of race"). It follows that the *sine qua non* for a gender-based equal protection claim is that the discrimination must be because of the plaintiff's gender.

---

[5] Since Stone's § 1981 claim is predicated on his equal protection claim, Stone's § 1981 claim against all Defendants other than Black, Eamer, and Kirkland is dismissed for failure to allege personal involvement. The same reasoning applies to Watson's § 1981 claim.

Watson alleges that after a search of her person, she was told to hold her bra and was not allowed to put it back on, despite her protests. Am. Compl. ¶ 40. An unnamed officer said he would "like to help her with that" and offered to put Watson's bra on for her. Id. While this conduct could possibly give rise to an equal protection claim based on gender, Watson fails to allege the personal involvement of any Defendant. Should Watson obtain the identities of the persons responsible for this conduct, she is instructed to amend the Amended Complaint. Therefore, this claim is dismissed without prejudice.

On another occasion, Watson alleges that Defendant White threatened to end her visit if she did not pull her dress up to cover her stomach and chest. Id. ¶ 31. The Court finds this allegation insufficient to state a claim against Defendant White, as it appears that Defendant White was simply attempting to enforce the dress code for prison visitors, rather than harassing Watson based on her gender. Accordingly, Watson's equal protection claim based on gender against Defendant White is dismissed.

When Watson complained about her interaction with Defendant White to Defendant Grant, he told Watson she "was a beautiful woman with a nice body" and that because of her "curves," she was going to have "these problems with these officers" because they "do not like that [she] deals with a black guy." Id. ¶ 31. While these allegations may overlap with Plaintiffs' claims for racial discrimination based on their status as an interracial couple, the Court is aware of no case law that supports Defendants' argument that a plaintiff forgoes the right to bring a gender discrimination claim because the same underlying conduct also forms the basis of a racial discrimination claim. However, the Court finds that Defendant Grant's comments to Plaintiff amount to nothing more than verbal harassment, which is not actionable under § 1983. See Johnson, 8 F. App'x at 143.

18

Watson's allegation that Defendant Mustizer did not reprimand or remove the officers responsible for refusing to allow her to put her bra back on is insufficient to sustain an equal protection claim based on gender. Am. Compl. ¶ 41. After Plaintiff explained what happened, Defendant Mustizer allowed her to put her bra back on. Id.

### 4. Retaliation Claims

Courts are instructed to approach claims of retaliation "'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 1001)), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002). In order to state a claim for First Amendment retaliation, a plaintiff must allege the following: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Id. at 352. At the motion to dismiss stage, a "complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983).

Plaintiffs allege that they were retaliated against for making grievances about alleged racial and discrimination when Defendant Martin planted drugs in Stone's cube and subsequently searched the cube, in violation of the First Amendment. Am. Compl. ¶¶ 48-49, 68. Since the filing of prison grievances is a constitutionally protected activity, Plaintiffs have stated the first prong of a First amendment retaliation claim. Franco v. Kelly, 854 F.2d 584, 590 (2d Cir. 1988) (filing a prison grievance is a constitutionally protected activity).

To satisfy the second element, Plaintiffs must allege that Defendants took adverse action against them because they filed grievances. The Second Circuit defines "adverse action" as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir. 2004). Inmates may be required to tolerate more than average citizens before a retaliatory action taken against them is considered adverse. Dawes, 239 F. 3d at 491. If a retaliatory act against an inmate would not be likely to "chill a person of ordinary firmness from continuing to engage" in the protected activity, the retaliatory act does not rise to the level of warranting constitutional protection. Id. at 493.

In the present case, Plaintiffs allege that Defendants retaliated against them by planting drugs in Stone's cube and subsequently searching the cube. Am. Compl. ¶¶ 48-49. This is a very serious accusation, which taken as true, would certainly have a chilling effect on similarly situated inmates exercising their First Amendment rights. As a result of drugs being found in his cube, Stone was subject to a disciplinary hearing and placed in SHU. The Court finds this sufficient to satisfy the second element of a First Amendment retaliation claim.

Turning to the third element, Plaintiffs must show that "the protected conduct was a 'substantial or motivating factor' in the prison officials' decision to take action against the plaintiff." Ciaprazi v. Goord, No. Civ. 02CV00915, 2005 WL 3531461, at *6 (N.D.N.Y. Dec. 22, 2005). When evaluating whether a causal connection exists, a court may consider "(1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation." Vega v. Artus, 610 F. Supp. 2d 185, 207 (N.D.N.Y. 2009) (quoting

20

Holmes v. Grant, No. 03 Civ. 3426, 2006 WL 851753, at *15 (S.D.N.Y. Mar. 31, 2006)).

The Court finds that Plaintiffs have met their burden of pleading a causal connection between their protected activity and the allegedly retaliatory act by Defendants. First, the Court notes the temporal proximity between Stone's meeting with Jones on December 11, during which he claims he expressed concerns that he would be retaliated against because of his grievances, and the search of Plaintiff's cube that was executed at 6:00 pm the same day. Am. Compl. ¶¶ 46-47. Stone contends that he and other inmates observed Defendant Martin take an object out of his pocket and drop it to the floor, and then claim that the packet fell from Stone's personal belongings. Id. ¶¶ 48-49. Defendant Martin then claimed that the object had fallen from one of Stone's possessions and revealed that it was a packet of drugs. Id. An inmate who corroborated Stone's account of events was allegedly disciplined as a result. Id. ¶ 50.

Turning to the second factor, the Court finds nothing in the record to suggest that Stone had a disfavorable behavioral record while incarcerated at Cape Vincent C.F. Furthermore, the Court notes that at the time of the alleged retaliatory acts, prison officials were generally aware that Stone and Watson had filed grievances against them. As for the third factor, Stone was not vindicated at his disciplinary hearing, but alleges instead that the hearing was unfair. Id. ¶ 53. He claims he was not permitted to call witnesses or to present evidence. Id. Stone requested that Defendant Jones produce the recording of their previous conversation, but Defendant Jones denied that any such recording existed. Id. Stone was then placed in SHU for ninety one days. Id. ¶ 54.

In further support of their contention that Defendants acted with retaliatory animus, Plaintiffs allege that Defendant Jones denied the existence of a recording of his meeting with Stone and that Defendants never responded to Watson's request to interview inmates who witnessed the search of

Stone's cube.  Id. ¶ 51.  When Watson went to the prison to retrieve books from Stone's cube, she was allegedly confronted by Defendant Graves, who stated "I don't do well with visitors who accuse my officers who work with great integrity of doing things that they don't do and I do not deal well with inmates who lie on my officers and say that they did things that they did not do.  They will be dealt with accordingly."  Id.  While these statements alone are not necessarily indicative of retaliatory animus, the Court finds that considering the factors discussed above and the totality of the circumstances, Plaintiffs have plausibily pleaded that Defendants planted the drugs in Stone's cube in retaliation for Plaintiffs' protected activity.  However, Plaintiffs only allege that Defendants Jones, Martin, Pratt, Knapp, McAuliffe, and Graves were personally involved in the conduct giving rise to Plaintiffs' retaliation claim.  Accordingly, Plaintiffs' retaliation claim against only these Defendants survives Defendants' Motion to dismiss.

### 5. Watson's Claim for Sexual Harassment

Plaintiffs argue that the terms and conditions of Plaintiffs' visitation were "altered for the worse" because of sexual harassment by Defendants.  Plaintiffs appear to argue that Defendants' conduct created a "hostile visiting environment" for them at Cape Vincent C.F.  The parties have not identified any cases in which such a claim has been recognized in federal court.

In Hayut v. State Univ. of N.Y., the Second Circuit evaluated whether the plaintiff had stated a claim for a "hostile education environment" involving alleged sexual harassment by a professor toward a student.  352 F.3d 733, 746 (2d Cir. 2003).  The court stated that § 1983 claims that are based on a hostile environment theory are governed by Title VII's hostile environment jurisprudence.  Id. at 744.  Therefore, a plaintiff must state that not only did the victim subjectively perceive the environment to be hostile or abusive, but also that the environment was objectively

hostile and abusive.  Id. at 745.  In other words, the environment created was "permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions' of the visiting environment."  Id. (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  As the Hayut court articulated, making a "hostility" determination in the educational context, as in the employment context, entails examining the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with" the victim's right to visitation.  Id.  Finding the harassment "pervasive" means that the challenged incidents are "more than episodic; they must be sufficiently continuous and concerted."  Carrero v. N.Y.C. Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989).  There must also be evidence that the alleged discrimination was carried out because of sex.  Hayut, 352 F.3d at 745.

Defendants argue that Plaintiffs' claim for sexual harassment pursuant to § 1983 must fail because Plaintiffs have not pleaded the personal involvement of any Defendant sufficient to show that such conduct was "pervasive enough" to state a claim under a hostile environment theory.  Reply at 12-13.  Defendants argue that Plaintiffs cannot group the conduct of Defendants in the aggregate, and must instead state a claim against each Defendant independently.  Because DOCCS and Cape Vincent C.F. cannot be liable under § 1983, the Court finds that Defendants' argument is correct and that Plaintiffs have failed to allege the personal involvement of any one Defendant that is sufficient to show that their sexual harassment created an environment that was permeated with discriminatory intimidation that was "sufficiently severe or pervasive to alter the conditions" of Plaintiffs' visitation.  As previously discussed with respect to Watson's equal protection claim based on gender, the allegations in the Amended Complaint pertaining to sexual harassment and

gender consist of either isolated incidents of verbal harassment or fail to identify the personal

involvement of a particular Defendant.  Similarly, the Court finds that Plaintiffs have failed to plead

sufficient allegations to show that the material terms of Plaintiffs' visitation were altered to sustain a

hostile environment claim based on sexual harassment under § 1983.

### 6. *Stone's Claim for Denial of Due Process During his Disciplinary Hearing*

Stone alleges that the planting of drugs in his cell and subsequent denial of his right to

present evidence and call witnesses at his disciplinary hearing amounts to a denial of due process

rights.  Am. Compl. ¶ 75.  Defendants argue that Plaintiffs have failed to allege the personal

involvement of any Defendant with respect to Stone's disciplinary hearing.  Reply at 13.  While the

Court finds that Plaintiffs have stated enough facts to assert a plausible due process claim against

"the unnamed hearing officer," due to Plaintiffs' failure to allege the personal involvement of any

named Defendant, this claim is subject to dismissal, without prejudice.  Should Plaintiffs ascertain

the identity of the unnamed hearing officer, they are instructed to file a Second Amended

Complaint.

The Court finds that the only Defendant Plaintiffs identify who was personally involved with

respect to Stone's due process claim is Defendant Jones, who allegedly denied Stone the recording

that was allegedly created during their meeting.  Am. Compl. ¶ 53.  Accordingly, Plaintiffs' due

process claim against Defendant Jones survives Defendants' Motion to dismiss.

### 7. *Conspiracy*

Plaintiffs argue that Defendants were acting in concert and with collaboration and purpose to

deny Plaintiffs their federally protected rights and to retaliate against them for engaging their

constitutional rights.  Am. Compl. ¶ 78.  Defendants argue that Plaintiffs do not articulate which

Defendants were involved in the alleged conspiracy and therefore fail to allege the personal involvement of any of the alleged Defendants. Reply. at 14. "[W]here the personal involvement of a defendant in a Section 1983 violation is premised upon a claim of conspiracy, '[i]t is incumbent on a plaintiff to state more than conclusory allegations to avoid dismissal of a claim predicated on a conspiracy to deprive him of his constitutional rights.'" Vega, 610 F. Supp. 2d at 199 (quoting Polur v. Raffe, 912 F.2d 52, 56 (2d Cir. 1990)).

The Court finds that Plaintiffs fail to assert any factual allegations to suggest that the individual Defendants were acting in concert to deprive them of their constitutional rights or to retaliate against them. Moreover, Plaintiffs' failure to assert the personal involvement of any Defendant with respect to their conspiracy claim is also proper grounds for dismissal. Accordingly, Plaintiffs' § 1983 conspiracy claim is dismissed.

### 8. Supervisory Liability

Where a plaintiff asserts a claim against a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. See Polk County v. Dodson, 454 U.S. 312, 325 (1981); Richardson v. Goord, 76 F.3d 431, 435 (2d Cir. 2003). In other words, supervisory officials may not be held liable merely because they held a position of authority. Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). Rather, supervisory personally may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) were grossly negligent in managing subordinates who caused the violation, or (5)

exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.  Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

Although the Amended Complaint does not specifically articulate these claims, it appears that Plaintiffs attempt to hold Defendant Fischer and Defendant Jones liable for their constitutional deprivations under the theory of supervisory liability, because they were aware of Plaintiffs' grievances and did not take appropriate action to remedy them.  Am. Compl. ¶¶ 46, 58.  However, it is well settled that the failure of a supervisory official to investigate a letter of protest by an inmate is not sufficient to show personal involvement.  Smart v. Goord, 441 F. Supp. 2d 631, 642-43 (S.D.N.Y. 1006); see also Harnett v. Barr, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) (stating that it is well established that an allegation that a prison official ignored a prisoner's letter of protest and request for an investigation is insufficient to hold that official liable for the alleged violations).  Accordingly, to the extent that Plaintiffs attempt to hold Defendant Fischer and Defendant Jones liable on a theory of supervisory liability, those claims are subject to dismissal.

### D.  Title VII

As a preliminary matter, the Court notes that DOCCS and Cape Vincent C.F. are not immune from suit for claims of intentional discrimination under Title VII.  See Alexander v. Sandoval, 532 U.S. 275, 280-81 (2001).  Defendants contend that Plaintiffs have failed to state a claim for racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000d et. seq..  Mem. at 21.  Plaintiffs allege that DOCCS and Cape Vincent C.F. are recipients of federal funding and have intentionally discriminated and/or have policies, practices, and/or procedures

which have the effect of discrimination on the basis of race.  Am. Compl. ¶¶ 84-85.[6]  Plaintiffs do not identify any specific policies, practices, or procedures on behalf of Defendants to sustain their Title VII claim.  Rather, Plaintiffs' Amended Complaint focuses on Defendants' conduct with respect to Plaintiffs specifically.

The nature of Plaintiffs' Title VII claim is a bit muddled.  In their Opposition, Plaintiffs clarify that the nature of their Title VII claim is a "private right of action under Title VII for disparate treatment,"  Opp'n at 21, but later state that "the court should disregard any arguments regarding disparate impact as they are irrelevant," Opp'n at 22.  Plaintiffs contend that their allegations of racial discrimination is "all that is required to succeed on a Title VII claim."  Id. at 22.

Defendants rely on the Supreme Court's holding in Alexander v. Sandoval, 532 U.S. 275 (2001) and argue that Plaintiffs must prove that DOCCS intentionally discriminated against them on the basis of their race in order to sustain a Title VII claim.  Mem. at 21-23.  In order to state a claim under Title VII, a plaintiff must show that the defendant discriminated against him on the basis of race, that the discrimination was intentional, and that the discrimination was a substantial or motivating factor for the defendant's actions.  Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001).

The United States Supreme Court established that an entity may be liable for intentional discrimination when it has been "deliberately indifferent."  Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 643 (1999) (finding that board of education can be liable for student-on-student harassment under Title IX).  The Second Circuit later extended Davis' deliberate

---

[6] In their Opposition, Plaintiffs clarify that they only assert a Title VII claim against DOCCS. Opp'n at 21.

indifference standard to the Title VII context. <u>Zeno v. Pine Plains Cent. Sch. Dist.</u>, 702 F.3d 655, 664-665 (2d Cir. 2012). Deliberate indifference based on racial discrimination can be shown from a defendants' actions or inaction in light of known circumstances. <u>Gant v. Wallingford Bd. of Educ.</u>, 195 F.3d 134, 140-41 (2d Cir. 1999).

In the present case, the Court finds that Plaintiffs have pleaded a prima facie case of intentional discrimination by DOCCS under Title VII. As previously discussed with respect to Plaintiffs' equal protection claim, Plaintiffs have set forth numerous examples of racial discrimination carried out by the individual Defendants against Plaintiffs. Plaintiffs reported these instances to supervisory personnel on numerous occasions. Drawing all inferences in Plaintiffs' favor, it is reasonable to conclude that DOCCS was aware of Plaintiffs' allegations and failed to take action. Accordingly, Plaintiffs have stated a claim of intentional discrimination based on their race against DOCCS based on a deliberate indifference standard.

### E. Supplemental Jurisdiction

Having found the several of Plaintiffs' causes of action survive Defendants' Motion to dismiss, the Court finds that it is appropriate to exercise supplemental jurisdiction over Plaintiffs' state law claim, as these claims arise from the same transaction or occurrence. <u>Treglia v. Town of Manlius</u>, 313 F.3d 713, 723 (2d Cir. 2002)) ("[E]xercise of supplemental jurisdiction was proper where plaintiff's state and federal claims arose 'out of approximately the same set of events.'").

## III.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 32) to dismiss is **GRANTED in part** and **DENIED in part**; and it is further

28

**ORDERED**, that the following claims are dismissed against all Defendants: First Amendment right of free association; Watson's equal protection claim based on gender; conspiracy; and sexual harassment under § 1983; and it is further

**ORDERED**, that all claims against DOCCS and Cape Vincent C.F. are dismissed except for Plaintiffs' Title VII claim for intentional discrimination against DOCCS; and it is further

**ORDERED**, that Plaintiffs' equal protection based on race and § 1981 claim for racial discrimination are dismissed except as to Defendants Eamer, Black, and Kirkland; and it is further

**ORDERED**, that Plaintiffs' retaliation claim under the First Amendment is dismissed except as to Defendants Jones, Martin, Pratt, Knapp, McAuliffe, and Graves; and it is further

**ORDERED**, that Plaintiffs' due process claim is dismissed except as to Defendant Jones; and it is further

**ORDERED**, that Fischer, White, Mustizer, Grant, and Miller, as well as John and Jane Doe Defendants are dismissed as Defendants in this action; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 31, 2016
              Albany, New York

Lawrence E. Kahn
U.S. District Judge