UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ANTHONY STONE, *et al.*,

                        Plaintiffs,

      -against-                                  7:15-CV-97 (LEK/ATB)

FREDERICK EAMER, *et al.*,

                         Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

On January 23, 2015, plaintiffs Anthony and Jaclyn Stone commenced this action. Dkt. No. 1 ("Complaint"). Plaintiffs' second amended complaint names as defendants New York State Department of Corrections and Community Supervision ("DOCCS"), Cape Vincent Correctional Facility ("Cape Vincent C.F."), DOCCS Commissioner Brian Fischer, DOCCS investigator Marc Miller, twelve other current and former DOCCS employees, and John and Jane Does. Dkt. No. 66 ("Second Amended Complaint"). Plaintiffs allege that Defendants discriminated and retaliated against them in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, and the New York State Constitution. Id. ¶¶ 61–86. Before the Court is Defendants' motion for summary judgment. Dkt. Nos. 105 ("Motion"), 105-43 ("Memorandum"). For the reasons that follow, the Motion is granted.

## II.    BACKGROUND

### A.  Factual History

Anthony Stone is an African-American male who was incarcerated in Cape Vincent C.F. during the period relevant to this action. Dkt. No. 105-42 ("Statement of Material Facts") ¶¶ 1–2. Jaclyn Stone, Anthony's wife, is a Caucasian female. Id. ¶¶ 3–4. On weekends in July, August, September, and October 2012, Jaclyn regularly visited Anthony in the Cape Vincent C.F. Visiting Room. Id. ¶ 20.

#### 1.  Visiting Room Incidents

##### a.  Frederick Eamer

During one visit, Plaintiffs stood in front of a microwave in the Visiting Room while linking arms. Dkt. No. 105-31 ("A. Stone Transcript") at 51. Anthony alleges that defendant Frederick Eamer, a Cape Vincent C.F. officer, told him, "I don't want you touching" Jaclyn. Id. at 52. At the same time, a non-interracial couple was allegedly embracing and kissing by the vending machine, and Eamer did not reprimand that couple when Anthony directed Eamer's attention to them. Id. Jaclyn similarly states that, on multiple occasions, Eamer reprimanded Plaintiffs for touching during their visits. Dkt. No. 105-30 ("J. Stone Transcript") at 164–65.

##### b.  Norman Kirkland

During the time Anthony was incarcerated in Cape Vincent C.F., inmates and visitors were permitted to take a picture at a photo booth in the Visiting Room if they purchased a token. SAC ¶ 33. During one visit, Plaintiffs purchased a token, but defendant Officer Norman

2

Kirkland[1] did not let them take a photo. Id. He allegedly told Plaintiffs that he "[s]hould stuff [the token] down both of [their] throats and make [them] fucking eat it." A. Stone Tr. at 45.

### c. Scott Black

During the period relevant to this action, before visiting an inmate in the Visiting Room, visitors were required to pass through a metal detector in a separate building. J. Stone Tr. at 106. Metal straps on bras could set off the metal detector alarm. Id. at 106. When a bra set off the alarm, Cape Vincent C.F. officers required the wearer to enter a bathroom, remove the bra, place it in a brown bag, pass through the metal detector, and put the bra back on once the wearer entered a second bathroom. J. Stone Tr. at 107–08.

Before one visit, Jaclyn was asked to remove her bra before passing through the metal detector, but was not allowed to put her bra back on before entering the Visiting Room. Id. at 141–42. Consequently, Jaclyn entered the Visiting Room without her bra and with her "nipples . . . exposed." Id. at 142. Jaclyn asked Black if she could put her bra back on, but Black ignored her question and directed her to her seat. Id. A sergeant then permitted Jaclyn to enter a bathroom and put her bra back on. Id. at 162. During another visit, Jaclyn alleges that Black seated Plaintiffs at a table near his desk at the front of the Visiting Room. Id. at 140. The table was near a garbage can that had "gnats coming out of" it. Id. Jaclyn asked Black to move Plaintiffs to a different table, but he refused. Id. at 138.

The final alleged incident with Black occurred when Jaclyn visited Anthony on October 27, 2012. SMF ¶ 35. During the visit, Plaintiffs used a microwave in the Visiting Room, which

---

[1] Kirkland has passed away since the period of Anthony's incarceration at Cape Vincent C.F., and he is represented by his estate as a defendant in this action. Mem. at 9.

was behind a red line and a sign that stated, "No inmates behind the red line." A. Stone Tr. at 57.

Black told Anthony to "step from behind the red line." Id. Anthony, who believed that "it's never

been a problem using either microwave . . . behind the red line for any inmate," approached a

nearby officer to ask him whether the "microwave is unaccessible [sic] today to inmates." Id. at

58–59. Anthony alleges that this angered Black, who then said, "Just like your kind. Daddy tell

you one thing, and you got to go run to mommy," "I'll fix you," and "[s]omething along the lines

like, 'You niggers.'" Id. at 59–60.

### 2. Plaintiffs' Complaints and Defendants' Investigations

The number and content of the complaints made by Plaintiffs to DOCCS and Cape

Vincent C.F. regarding their treatment in the Visiting Room is not entirely clear from the record.

This section outlines those complaints that are clearly described in the record. First, on

October 6, 2012, Jaclyn complained to Bryan McAuliffe, the Deputy Superintendent of Cape

Vincent C.F., regarding "her concerns with seating arrangements in the visit room."

Dkt. No. 110-4 ("Exhibit C"). Specifically, Jaclyn complained that, in "the majority of" her

visits, J. Stone Tr. at 173, she and Anthony were seated "in the first row closest to the officers'

desk," Dkt. No. 75-3 ("J. Stone Affirmation") at 1.[2] On October 7, DOCCS Lieutenant Gary Bass

interviewed Jaclyn regarding her complaint. Ex C. In an email, Bass informed McAuliffe that, on

October 7, he saw Plaintiffs seated in the back of the Visiting Room. Ex. C.

Second, around October 29, 2012, Jaclyn called defendant Jeremy Knapp, a Cape Vincent

C.F. captain, and complained to him about the October 27 incident where Black allegedly

---

[2]  The cited page numbers for this document refer to those generated by the Court's
electronic filing system ("ECF").

shouted at Anthony. Dkt. No. 105-7 ("Exhibit F"). Knapp directed Sergeant Staveckis to

investigate her complaint. Dkt. No. 110-3 ("Knapp Transcript") at 35. On October 30, Staveckis

interviewed Anthony regarding the October 27 incident, and asked him "if there was an issue

with staff, if someone was swearing or using racial language," and "if he remembers anyone

around his table who could confirm any allegation" made by Plaintiffs. Dkt. No. 105-8

("Exhibit G"). Staveckis reported, "Stone refused to tell me anything regarding his 10/27/12

visit." Id. Staveckis also interviewed Black, and asked him "if he or anyone else was swearing or

using language with racial overtones toward" Plaintiffs or other inmates or visitors in the Visiting

Room. Id. Black, in a memo dated November 2, 2012, denied swearing or using racial slurs

toward Plaintiffs or others in the Visiting Room. Dkt. No. 105-9 ("Exhibit H").

      Third, on October 28, 2012, Anthony wrote a letter detailing the alleged incidents of

harassment described above. Dkt. No. 105-6 ("Exhibit E") at 1.[3] DOCCS's Central Office

received this letter on December 5, 2012, id., and, on December 6, DOCCS asked Patricia

LeConey, Cape Vincent C.F.'s Superintendent, to investigate the complaint, SMF ¶ 41. On

December 11, defendant Norman Jones, a DOCCS lieutenant, interviewed Anthony regarding

Plaintiffs' complaints. Id. ¶ 43. Anthony alleges that Jones "press[ed] record on a tape recorder"

before conducting the interview. A. Stone Tr. at 73. Jones denies recording the interview. Dkt.

No. 105-40 ("Jones Transcript") at 17.

      Anthony stated that he told Jones he was concerned about facing retaliation for filing a

complaint against Cape Vincent C.F. officers. A. Stone Tr. at 73. He also told Jones that "since

[the October 27 incident] the 'regular' visit room officers have been working" and neither

---

[3]  The cited page numbers for this document refer to those generated by ECF.

Plaintiff had experienced discrimination in the Visiting Room since that time. Dkt. No. 105-14 ("Exhibit M"). Jones believed that, because Plaintiffs were no longer being harassed in the Visiting Room when he interviewed Anthony, "the matter [was] disposed of." Jones Tr. at 12–13.

Knapp, in a memo sent to Superintendent LeConey, concluded that he "found no evidence to substantiate the allegations made by" Plaintiffs. Dkt. No. 105-22 ("Exhibit U"). Knapp mentioned that the officers who allegedly harassed Plaintiffs denied doing so, that Anthony identified "no witnesses to collaborate his claims," and that officers "occasionally" seated Plaintiffs in the front of the Visiting Room in order "to control the inappropriate physical contact between them." Id. In a letter to Anthony dated December 21, 2012, DOCCS Deputy Commissioner Joseph Bellnier stated that Anthony "failed to provide additional information or witnesses" to substantiate his allegations of harassment in the Visiting Room. Dkt. No. 105-27 ("Exhibit Z"). The letter concluded by informing Anthony that his "allegations of unprofessional conduct by staff" were "unsubstantiated." Id.

### 3. Alleged Retaliation

On December 11, 2012, Ernest Mustizer, a Cape Vincent C.F. Sergeant, found a note on the ground from a confidential informant stating that someone in Anthony's housing cube was dealing drugs. Dkt. No. 105-15 ("Exhibit N") at 1.[4] After receiving this note, Mustizer authorized defendant Officer Jackie Pratt to perform a "cube frisk"—in other words, a search—of Anthony's cell. Id.; Dkt. No. 105-33 ("Martin Transcript") at 25; Dkt. No. 105-32 ("Pratt Transcript") at 27. Anthony states that, when Pratt and defendant Officer Shawn Martin searched his cell that

---

[4]  The cited page numbers for this document refer to those generated by ECF.

evening, Martin placed a piece of tin foil on the ground, opened the foil and said, "[t]here's marijuana here." A. Stone Tr. at 77. Martin and Pratt deny this assertion. Martin Tr. at 29; Pratt Tr. at 44–45. Pratt states that she found the foil inside a magazine in the cell. Pratt Tr. at 44–45. Pratt "issued an Inmate Misbehavior Report to [Anthony] Stone for possessing contraband." SMF ¶ 49. Anthony was immediately transferred from his cell into confinement in a special housing unit ("SHU"). Martin Tr. at 39. A test of the substance in the foil revealed that the foil contained amphetamines. Pratt Tr. at 59.

Anthony attended a disciplinary hearing following the issuance of his inmate misbehavior report and his transfer to SHU. SAC ¶ 53; A. Stone Tr. at 76. At the hearing, Anthony asked Jones for a tape recording of their December 11 interview. A. Stone Tr. at 76. Jones denied the existence of a tape recorder. Id. Following the apparently unsuccessful disciplinary hearing, Anthony was confined in SHU at Cape Vincent until January 4, 2013. Dkt. No. 105-2 ("Exhibit A"). On January 4, 2013, he was transferred to Goveurneur Correctional Facility, and was confined in SHU at this facility until March 11, 2013. Id.

Pratt and Martin were both unaware of Plaintiffs' discrimination complaints before searching Anthony's housing cube. Martin Tr. at 77–78; Pratt Tr. at 73–74. Knapp states that he informed Graves of Plaintiffs' complaints as part of his investigation of the complaints. Knapp Tr. at 41. Graves states that he did not know that Anthony had filed a complaint and did not know the nature of Jaclyn's complaints. Dkt. No. 110-2 ("Graves Transcript") at 24–26. On December 16, 2012, Graves and Jaclyn had an argument in Cape Vincent C.F.'s "Admin lobby." Dkt. No. 105-23 ("Exhibit V"). Jaclyn states that Graves told her, "I don't do well with people that accuse my officers of things they don't do." J. Stone Tr. at 191. She responded, "I don't do

7

well with officers that set my husband up just because we're an interracial couple," and Graves

said, "That's how we do things around here." Id. at 192.

**B. Procedural History**

On January 23, 2015, Plaintiffs initiated this action, Compl., and, on January 30, 2015,

filed an amended complaint that named as defendants DOCCS, Cape Vincent C.F., former

DOCCS Commissioner Brian Fischer, Officer White, Black, Eamer, Grant, Graves, Jones,

Kirkland, Knapp, Martin, McAuliffe, Mustizer, Pratt, Marc Miller, and John and Jane Does.

Dkt. No. 4 ("Amended Complaint"). In their Amended Complaint, Plaintiffs alleged that

(1) Defendants discriminated against them on the basis of race and against Jaclyn on the basis of

her gender in violation of 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth

Amendment as enforced through 42 U.S.C. § 1983; (2) retaliated against them in violation of

§ 1981 and the First Amendment; (3) sexually harassed Jaclyn in violation of the Equal

Protection Clause; (4) violated Anthony's due process rights; (5) conspired to discriminate and

retaliate against Plaintiffs; (6) violated Title VI; and (7) violated the New York State

Constitution. Am. Compl. ¶¶ 61–86.

In a March 31, 2016 Memorandum-Decision and Order, the Court (1) dismissed

Plaintiffs' free association and conspiracy claims; (2) dismissed Jaclyn's equal protection and

sexual harassment claims; (3) dismissed Fischer, White, Mustizer, Grant, Miller, and John and

Jane Does as defendants in this action; (4) dismissed all claims against DOCCS and Cape

Vincent C.F. except for Plaintiffs' Title VI intentional discrimination claim against DOCCS;[5] (4)

---

[5] The March 2016 Order states that it dismissed Plaintiffs' "Title VII claim." Mar. 2016 Order at 29. However, Plaintiffs brought a Title VI claim, not a Title VII claim, against Defendants, Am. Compl. ¶¶ 83–86, Defendants construed the Amended Complaint as alleging a

dismissed Plaintiffs' §§ 1981 and 1983 racial discrimination claims against all defendants except

for Eamer, Black, and Kirkland; (4) dismissed Plaintiffs' retaliation claims against all defendants

except for Jones, Martin, Pratt, Knapp, McAuliffe, and Graves; and (5) dismissed Plaintiffs' due

process claim against all defendants except for Jones. Dkt. No. 41 ("March 2016 Order") at 29.

On October 7, 2016, the Court permitted Plaintiffs to file a second amended complaint.

Dkt. No. 65 ("October 2016 Order"); see also Dkt. No. 66 ("Second Amended Complaint"). The

Court permitted Plaintiffs to "replead . . . claims . . . that Judge Kahn dismissed with prejudice

 . . . so as not to waive any appellate rights with respect to those dismissals." Oct. 2016 Order.

However, the Court clarified that "those claims and defendants . . . shall remain dismissed

pursuant to" the March 2016 Order. Id. Furthermore, the October 2016 Order permitted Jaclyn to

replead her gender discrimination claims against Officer John Doe, and permitted Anthony to

replead his due process claim against Hearing Officer John Doe. Id.; see also SAC ¶¶ 39–40, 53,

64–66, 73–76. The SAC repleads each cause of action from the Amended Complaint, but

substitutes Donna M. Kirkland for Norman Kirkland, as the executrix of his estate, changes

Jaclyn Watson's last name to Stone to reflect her name change after her marriage to Anthony,

adds Officer John Doe as a defendant with respect to Jaclyn's gender discrimination claims, and

adds Hearing Officer John Doe as a defendant with respect to Anthony's due process claim.

SAC.

On November 17, 2016, Defendants moved for partial summary judgment on several of

Plaintiffs' surviving claims. Dkt. No. 68 ("Motion for Partial Summary Judgment"). The Court,

---

Title VI violation, Dkt. No. 32-1 ("Motion to Dismiss") at 21, and the Court's analysis relies on
Title VI jurisprudence, Mar. 2016 Order at 26–28. Therefore, the Court reads the March 2016
Order's dismissal of Plaintiffs' "Title VII claim" as a dismissal of their Title VI claim.

in a June 30, 2017 Decision and Order, denied Defendants' motion with leave to renew, and

provided Plaintiffs with additional time to gather evidence to substantiate their claims.

Dkt. No. 98. On September 29, 2017, Defendants moved for summary judgment on all of

Plaintiffs' surviving claims. Mot; Mem. Plaintiffs opposed the Motion, Dkt. No. 110-7

("Response"), and Defendants filed a reply, Dkt. No. 114 ("Reply").

## III.    LEGAL STANDARD

A court must grant summary judgment if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "[A] party

seeking summary judgment always bears the initial responsibility of informing the district court

of the basis for its motion, and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). The nonmoving party must then "make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial." Id.

While the nonmoving party must do "more than simply show that there is some

metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986), a court at the summary judgment stage must "review all of the

evidence in the record. In doing so, however, the court must draw all reasonable inferences in

favor of the nonmoving party, and it may not make credibility determinations or weigh the

evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see United

States ex rel. O'Donnell v. Countrywide Home Loans, Inc., 822 F.3d 650, 653 n.3 (2d Cir. 2016).

## IV.    DISCUSSION

As stated above, the claims and defendants dismissed in the March 2016 Order remain

dismissed from this action, except for the claims against the John Doe defendants. Below, the

Court addresses Plaintiffs' surviving claims.

### A.  Claims against John Doe Defendants

Plaintiffs allege various causes of action against Officer John Doe and Hearing Officer

John Doe. SAC ¶¶ 39–40, 53, 64–66, 73–76. "Because Plaintiffs failed to identify [the John Doe

defendants] during the course of discovery, any claims against them must be dismissed." Bishop

v. City of New York, No. 13-CV-9203, 2016 WL 4484245, at *3 (S.D.N.Y. Aug. 18, 2016)

(citing Valentin v. Dinkins, 121 F.3d 72, 75 (2d Cir. 1997)). Accordingly, Jaclyn's gender

discrimination claims, brought against Officer John Doe under §§ 1981 and 1983, and Anthony's

due process claims, brought against Hearing Officer John Doe under § 1983, do not survive

summary judgment.

### B.  Section 1981 and 1983 Racial Discrimination Claims

Plaintiffs allege that Defendants discriminated against them in violation of § 1981 and the

Equal Protection Clause of the Fourteenth amendment, alleged pursuant to § 1983. SAC

¶¶ 61–62. Specifically, Plaintiffs allege that Defendants discriminated against them in the Cape

Vincent C.F. Visiting Room because they are in an interracial relationship. E.g., id. ¶¶ 28–41. In

the March 2016 Order, the Court permitted Plaintiffs to proceed with their § 1981 claim "to the

extent that [they have] stated a valid equal protection claim" based on racial discrimination,

reasoning that their "equal protection claim may serve as the basis for [their] § 1981 claim under

[§ 1981's] equal benefit clause." Mar. 2016 Order at 12.

11

Section 1983 provides "a private right of action against any person who, acting under the color of state law, causes another person to be subjected to the deprivation" of a right, privilege, or immunity secured by the Constitution or laws of the United States. Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999). A valid claim under § 1983 requires a showing of personal involvement by the defendant in the alleged constitutional deprivation. Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). In § 1983 actions, the doctrine of respondeat superior is unavailable. Polk County v. Dodson, 454 U.S. 312, 325 (1981).

The Fourteenth Amendment states, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race." Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000). To establish intentional discrimination for purposes of the Equal Protection Clause,

> A plaintiff could point to a law or policy that expressly classifies persons on the basis of race. Or, a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. A plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.

Pyke v. Cuomo, 258 F.3d 107, 109 (2d Cir. 2001). "Additionally, a plaintiff may claim . . . selective enforcement of the law." Savino v. Town of Southeast, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013) (citing LeClair v. Saunders, 627 F.2d 606, 609–10 (2d Cir. 1980)). To establish a selective enforcement claim, "a plaintiff must prove that (1) 'compared to others similarly situated, [he or she] was selectively treated,' and (2) 'such selective treatment was

based on impermissible considerations such as race [or] religion.'" Id. at 305 (quoting Diesel v. Town of Lewisboro, 232 F.2d 92, 103 (2d Cir. 2000)). Under the first element, a plaintiff must be "similarly situated 'in all material respects' to the parties with whom he seeks to compare himself to." McKinney v. Bennett, No. 06-CV-13486, 2009 WL 2981922, at *7 (S.D.N.Y. Sept. 16, 2009) (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)).

Below, the Court addresses Plaintiffs' equal protection claims against Kirkland's estate, Eamer, and Black.

### 1. Kirkland

Plaintiffs allege that, during one of Jaclyn's visits, Kirkland did not let them use a purchased token to take a photo at the photo booth in the Visiting Room. SAC ¶ 33. Instead, Kirkland told Plaintiffs that he "[s]hould stuff [the token] down both of [their] throats and make [them] fucking eat it." A. Stone Tr. at 45. The record does not provide context for this quote, and contains no evidence suggesting that Kirkland ever made statements raising an inference of racial animus, or that Kirkland treated similarly situated White visitors or inmates differently when they sought to use the photo booth. The limited evidence Plaintiffs provide is insufficient to raise an inference that Kirkland's denial of Plaintiffs' privilege to use the photo booth was motivated by racial discrimination.

### 2. Eamer

Plaintiffs argue that Eamer disproportionately reprimanded Plaintiffs for inappropriate physical contact in Cape Vincent C.F.'s Visiting Room. Both Plaintiffs recall instances in their depositions where Eamer scolded them for physical contact while not similarly reprimanding couples who were in non-interracial relationships. A. Stone Tr. at 51–52; J. Stone Tr. at 163–65.

13

However, evidence that Eamer did not punish similarly situated non-interracial couples only establishes the first prong of a selective enforcement claim. Plaintiffs cannot establish that Eamer's selective treatment was based on race by "merely rest[ing] on a showing of disparate treatment." Anderson v. City of New York, 817 F. Supp. 2d 77, 95 (E.D.N.Y. 2011) (quoting Bizzarro v. Miranda, 394 F.3d 82, 87 (2d Cir. 2005)). Rather, they must "offer . . . evidence that [Eamer] acted with purposeful discrimination based on" their status as an interracial couple. Id. They have not done so. Plaintiffs do not allege that Eamer ever used racially charged language toward them, and Jaclyn explicitly concedes that Eamer never used such language toward her. J. Stone Tr. at 164–65. Moreover, no evidence suggests that Eamer's alleged stringent monitoring of Plaintiffs' physical contact with one another was motivated by racial animus.

Jaclyn's deposition testimony also describes, in detail, her interaction with Eamer during a visit when he asked her to pull her skirt up before entering the Visiting Room. J. Stone Tr. at 160–61. This interaction does not support Plaintiffs' equal protection claim. No gender discrimination claim in this action survives against Eamer and, in any event, the March 2016 Order clarified that this interaction was an "attempt[] to enforce the dress code for prison visitors, rather than harassing [Jaclyn] based on her gender." Mar. 2016 Order. To the extent that this interaction is meant to serve as evidence of discrimination against Plaintiffs as an interracial couple, it fails to create an inference of racial animus on Eamer's part.

### 3. Black

#### a. The "Red Line" Incident

On October 27, 2012, Plaintiffs used a microwave in the Visiting Room that was behind a red line with a sign next to it that stated, "No inmates behind the red line." A. Stone Tr. at 57–58.

14

Black told Anthony to "step from behind the red line." Id. at 58. Anthony was "confused" because he stated that inmates were regularly allowed to use the microwaves behind the red line. Id. When Anthony tried to ask another officer whether he could step behind the red line to use the microwave, Black allegedly shouted, "Just like your kind. Daddy tell you one thing, and you got to go run to mommy." Id. Black then threatened to "fix" Anthony, said "[s]omething along the lines like, 'You niggers,'" and said, "I believe I could have your black ass sent to Canada." Id. at 59–60. Black denied using racial slurs toward Plaintiffs or others in the Visiting Room. Ex. H.

The statements attributed to Black are appalling, and obviously indicative of racial animus. However, while the use of racial epithets is worthy of condemnation, it does not, without evidence of an additional injury, constitute an equal protection violation. Ali v. Connick, 136 F. Supp. 3d 270, 276 (E.D.N.Y. 2015); see Baskerville v. Goord, No. 97-CV-6413, 2000 WL 897153, at *3 (S.D.N.Y. July 6, 2000) ("Mere verbal abuse or the use of racial slurs or epithets reflecting racial prejudice, although reprehensible, does not form the basis of a claim pursuant to § 1983."). Plaintiffs argue that verbal harassment "by prison officials may be actionable when done maliciously." Resp. at 5 (citing Glover v. Gruner, No. 15-CV-632, 2015 WL 4254131, at *2 (S.D. Ill. July 13, 2015)). However, while some district courts have held that continuous, severe verbal harassment can constitute an equal protection violation, e.g., Adair v. Hunter, 236 F. Supp. 3d 1034, 1040 (E.D. Tenn. 2017) (stating that, although "isolated incidents of verbal harassment do not rise to the level of constitutional violations . . . where . . . a plaintiff alleges ongoing harassment, the equal protection clause applies"); Harlan v. Holland, No. 13-CV-263, 2013 WL 6668734, at *4 (E.D. Tenn. Dec. 18, 2013) ("Use of insulting racial epithets accompanied by harassment or a violation of established rights may amount to a separate equal

protection claim."), it is clear that an isolated incident where racial slurs are used cannot form the basis of an equal protection claim, see Brims v. Barlow, 441 F. App'x 674, 678 (11th Cir. 2011) ("[T]he isolated use of a racial epithet, while deplorable, does not rise to the level of an" equal protection violation); Ellis v. Ficano, 75 F.3d 361 (6th Cir. 1995) ("[I]solated threats and verbal abuse are not violations of constitutional magnitude."); Lewis v. Reisener, No. 13-CV-327, 2016 WL 6997912, at *2 (W.D. Mich. Nov. 30, 2016) (finding that, although "a pattern of racial harassment involving racial slurs may violate the Equal Protection Clause," a defendant's use of a severe slur five times over three years "does not amount to a pattern of racial harassment").

Because racial epithets are not, by themselves, evidence of an equal protection violation, what remains of Plaintiffs' allegations regarding the October 27 incident is a selective enforcement claim: Black unfairly enforced against Plaintiffs the Visiting Room policy prohibiting inmates from crossing the red line. It is undisputed that this policy existed, e.g., Dkt. No. 105-39 ("McAuliffe Transcript") at 54–55 (stating that only visitors are permitted to use the microwaves and inmates may not cross the red line); Dkt. No. 110-4 ("Black Transcript") at 41–43 (same), but it is unclear how regularly officers enforced this rule, compare Black Tr. at 43 (stating that he has observed officers ordering inmates to step behind the red line) with A. Stone Tr. at 57–58 ("[I]t's never been a problem using either microwave that's behind the red line for any inmate whatsoever."). Even if Anthony correctly stated that he has not observed other Cape Vincent C.F. officers reprimanding inmates for crossing the red line, Plaintiffs provide no evidence to show that *Black* permitted similarly situated non-interracial couples to cross the red line. Therefore, Black's refusal to let Anthony use the microwave behind the red line did not constitute an equal protection violation, his alleged use of racial slurs

16

notwithstanding. See Greene v. City of New York, No. 08-CV-243, 2017 WL 1030707, at *30 (E.D.N.Y. Mar. 15, 2017) (granting summary judgment against plaintiff's equal protection claim because, even though plaintiff provided evidence that an officer used racial slurs, he provided no evidence that the officer "treated similarly situated non-minority groups differently"); Oliver v. Cuttler, 968 F. Supp. 83, 88 (E.D.N.Y. 1997) ("Since racial slurs, alone, fail to state a violation of the equal protection clause, the plaintiff's failure to prove . . . that similarly situated non-minorities would have been treated differently . . . is fatal to the plaintiff's claim.").

### b. The Bra Incident

During the period relevant to this action, visitors had to pass through a metal detector before entering the Visiting Room. J. Stone Tr. at 107–08. When a visitor's bra set off the metal detector's alarm, the visitor had to remove their bra in a bathroom and put the bra back on after successfully passing through the metal detector. Id. During one visit, Jaclyn was asked to remove her bra, but, after removing her bra, she was not permitted to put her bra back on. Id. at 143–44. When Jaclyn entered the Visiting Room, she asked Black if she could put her bra back on, and he ignored her question and directed her to her seat. Id. at 142. A sergeant then told Jaclyn that she could enter a bathroom and put her bra on. Id. at 143.

It was an unnamed officer, not Black, who required Jaclyn to walk from the metal detector to the Visiting Room without wearing a bra. The available evidence does not establish that this unnamed officer committed an equal protection violation when he or she forbade Jaclyn from putting her bra back on. No evidence suggests, for instance, that this officer was motivated by racial animus or treated any similarly situated visitors differently. Therefore, there is insufficient evidence to establish that Black's failure to remedy this officer's behavior constitutes

his personal involvement in a constitutional violation. Cf. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (holding that personal involvement can be established if "the defendant, after being informed of the violation . . ., failed to remedy the wrong"). Moreover, Black's failure to respond to Jaclyn's question was inconsequential because a sergeant immediately permitted Jaclyn to put her bra back on. Because the evidence does not establish that Black failed to remedy another officer's alleged constitutional violation and his participation in this incident did not cause Jaclyn to suffer additional disparate treatment, this incident does not establish an equal protection claim against Black.

### c.  The Seating Incident

Plaintiffs allege that, during one visit, Black seated them at a table near his desk at the front of the Visiting Room. J. Stone Tr. at 140. The table was near a garbage can that had "gnats coming out of" it. Id. Jaclyn asked Black to move them to a different table, but he refused. Id. at 138. Plaintiffs allege more generally that they were regularly seated in the front of the Visiting Room while Anthony was incarcerated at Cape Vincent C.F., although they are inconsistent about the frequency of this occurrence. Id. at 173 (stating that Plaintiffs were seated in the front "[n]ot every single time, but the majority of the time"); J. Stone Affirmation at 1 (claiming that Plaintiffs were seated at the front of the Visiting Room "for each visit"); Dkt. No. 75-2 ("A. Stone Affirmation") at 1 (same).[6] Jaclyn explained that being seated in the front was discriminatory because "[t]he seats in the front were reserved for people that were in trouble. J. Stone Tr. at 174.

---

[6]  The cited page numbers for this document refer to those generated by ECF.

Black's decision to seat Plaintiffs in front of the Visiting Room does not constitute an equal protection violation because, once more, this is a selective enforcement claim, and Plaintiffs provide insufficient evidence of similarly situated couples who received preferential treatment. Plaintiffs generally allege that they were frequently seated in the front of the Visiting Room while "couples who were not of different races" were not. J. Stone Affirmation at 1; A. Stone Affirmation at 1. However, officers "occasionally" seated Plaintiffs near the front of the Visiting Room "in an attempt to control the inappropriate physical contact between them" because Plaintiffs had a history of receiving counseling for inappropriate touching. Ex. U; see also Ex. D (listing two instances where Anthony was counseled for inappropriately touching Jaclyn); Ex. G (describing a conversation between Staveckis and Anthony where Anthony conceded that, on October 27, 2012, he took two "lewd" photos with Jaclyn in the Visiting Room photo booth).

A similarly situated couple for the purposes of Plaintiffs' selective enforcement claim would be a non-interracial couple who had a similar history of inappropriate touching in Cape Vincent C.F., but who Black did not frequently seat in the first row of seats in the Visiting Room. See McKinney, 2009 WL 2981922, at *7 (holding that African-American state trooper who was terminated from his position was not similarly situated to White troopers because he "ha[d] not shown these people to have a comparable disciplinary history to his own"); Redd v. New York State Div. of Parole, 923 F. Supp. 2d 371, 391 (E.D.N.Y. 2012) ("Whether the alleged comparators had similar disciplinary histories is important to whether their actions called for the same penalty that [plaintiff] received."). Plaintiffs do not identify such a couple. Accordingly,

19

their selective enforcement claim regarding Black's decision to seat them in the front of the Visiting Room cannot survive summary judgment.

### 4. *Plaintiffs' Other Discrimination Arguments*

Plaintiffs' Response meanders through several other arguments that are not tied to a particular defendant but purportedly support their equal protection claim. Resp. at 2–7. The Court addresses each of these arguments below.

### a. Conspiracy

Plaintiffs urge the Court to avoid analyzing Kirkland, Eamer, and Black's alleged behavior individually, and to instead consider their behavior as evidence of a conspiracy to violate Plaintiffs' equal protection rights. Resp. at 2. Defendants correctly observe that there is no surviving conspiracy claim in this action. Mem. at 11 (citing Mar. 2016 Order at 29). Moreover, "[t]he intracorporate conspiracy doctrine 'bars conspiracy claims against employees of entities such as [DOCCS] (when those employees are alleged to have conspired solely with each other) unless, pursuant to the doctrine's scope of employment exception, the employees "were pursuing personal interests wholly separate and apart from the entity by whom they were employed." Richard v. Fisher, 38 F. Supp. 3d 340, 353 (W.D.N.Y. 2014) (internal quotation marks omitted) (alteration in original). Eamer, Black, and Kirkland were all DOCCS employees at the time the alleged conspiracy took place, and none of their alleged violations of Plaintiffs' rights to equal protection were "wholly separate and apart from" their employment at DOCCS. Therefore, even if Plaintiffs had a surviving conspiracy claim against Eamer, Black, and Kirkland, it would be dismissed under the intracorporate conspiracy doctrine. See Richard v. Leclaire, No. 15-CV-6, 2017 WL 4349381, at *5 (N.D.N.Y. Sept. 29, 2017) (affirming magistrate judge's

20

recommendation to dismiss plaintiffs' conspiracy claims under the intracorporate conspiracy

doctrine because defendants each worked for DOCCS and defendants' alleged conduct was not

"wholly separate from DOCCS and their employment by DOCCS").

b.  Hostile Environment

Plaintiffs also argue that, even if each Defendants' acts, taken alone, are insufficient to

establish an equal protection violation, "consideration of the circumstances as a whole" would

establish the existence of a "hostile environment." Resp. at 1–2. However, the Court is unaware

of any authority suggesting that an inmate can use a "hostile environment" claim to transform

isolated allegations of racial discrimination by correctional officers against inmates and their

visitors into an equal protection violation. Plaintiffs do not provide any such authority—instead,

they cite numerous opinions discussing how an employer's discrimination against its employees

may result in a hostile work environment and lead to Title VII liability. Resp. at 2. The Court

will not apply reasoning from Title VII hostile work environment case law to Plaintiffs' equal

protection claim in the absence of any authority suggesting that this is possible.

For these reasons, the Court grants Defendants' Motion with respect to the §§ 1981 and

1983 racial discrimination claims brought against Eamer, Kirkland, and Black.

**C.  First Amendment Retaliation Claims**

Plaintiffs allege that Defendants retaliated against them for filing numerous grievances

regarding their alleged mistreatment in the Visiting Room. SAC ¶¶ 67–69. After the March 2016

Order, Plaintiffs' retaliation claims survived against Jones, Martin, Pratt, Knapp, McAuliffe, and

Graves. Mar. 2016 Order at 28. "To prevail on a First Amendment retaliation claim, an inmate

must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took

21

adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks omitted). "Because claims of retaliation are easily fabricated, the courts must 'examine prisoners' claims of retaliation with skepticism and particular care.'" Rivera v. Goord, 119 F. Supp. 2d 327, 339 (S.D.N.Y. 2000) (quoting Coughlin, 58 F.3d at 872).

For the reasons provided below, Plaintiffs fail to establish their retaliation claims against any of the remaining defendants.

### 1. *McAuliffe and Knapp*

Plaintiffs' retaliation claims against McAuliffe and Knapp are based on the alleged failure of these defendants to adequately respond to their Visiting Room complaints. Anthony stated that, after McAuliffe learned of these complaints, he delegated investigation of the complaints to subordinate officers instead of transferring Anthony to a different correctional facility. A. Stone Tr. at 90. Similarly, Anthony stated that Knapp retaliated because he learned of Plaintiffs' complaints and subsequently "made the decision not to do anything." Id. at 86.

In the employment context, the Second Circuit has held that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse action taken in retaliation for the filing of the same discrimination complaint" because "[a]n employee whose complaint is not investigated cannot be said to have thereby suffered a punishment for bringing that same complaint." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 721 (2d Cir. 2010). Such reasoning is even more applicable to a prisoner's retaliation claim, because "[p]risoners may be required to tolerate more than . . . average citizens, before a [retaliatory] action taken against them is considered adverse." Vega v. Artus, 610 F. Supp. 2d 185, 206–07

(N.D.N.Y. 2009) (quoting <u>Dawes v. Walker</u>, 239 F.3d 489, 491 (2d Cir. 2001)). Plaintiffs'

retaliation claims against Knapp and McAuliffe are premised solely on their alleged failure to

investigate Plaintiffs' discrimination complaints. Accordingly, Plaintiffs have not established the

existence of an adverse action, and the retaliation claims against Knapp and McAuliffe cannot

survive summary judgment.

### 2. *Martin and Pratt*

On December 11, 2012, Sergeant Mustizer received an anonymous tip indicating that

someone was dealing drugs from Anthony's housing cube. SMF ¶ 45. Based on this tip, he

authorized Pratt to search Anthony's cube. <u>Id.</u> ¶ 46. Pratt and Martin searched Anthony's cube

that evening. <u>Id.</u> ¶ 47. Anthony alleges that, during this search, Martin planted amphetamines in

his cube, and Pratt subsequently issued Anthony "an Inmate Misbehavior Report . . . for

possessing contraband." <u>Id.</u> ¶ 49.

Drawing all inferences in Plaintiffs' favor, a reasonable jury could conclude that Martin

and Pratt planted amphetamines in Anthony's cube, which suffices to establish an adverse action

for the purpose of a First Amendment retaliation claim. <u>See</u> <u>Williams v. King</u>, 56 F. Supp. 3d

308, 328 (S.D.N.Y. 2014) (finding that planting contraband in an inmate's cell is an adverse

action). However, Plaintiffs' retaliation claims against Martin and Pratt fail because they provide

insufficient evidence to establish that Martin and Pratt planted drugs in response to Plaintiffs'

discrimination complaints against other Cape Vincent C.F. staff.

"In this Circuit, a plaintiff can indirectly establish a causal connection to support

a . . . retaliation claim by 'showing that the protected activity was closely followed in time by the

adverse [employment] action.'" <u>Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.</u>,

252 F.3d 545, 554 (2d Cir. 2001) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)). "In the context of prisoner retaliation claims," although evidence of temporal proximity is probative of a causal connection, more evidence of causation is necessary to survive summary judgment. Davis v. Florence, 600 F. App'x 26, 27 (2d Cir. 2015). The search took place on December 11, 2012, and Plaintiffs submitted their numerous discrimination complaints in October. E.g., Exs. C, E, F. Moreover, Jones interviewed Anthony regarding these complaints earlier on December 11. SMF ¶ 44.

This evidence of temporal proximity, standing alone, is insufficient to establish causation and defeat summary judgment, and Plaintiffs provide no other evidence of Pratt and Martin's retaliatory motivation. Moreover, typically, "alleged retaliation motivated by an action the prisoner took which did not personally involve the prison officials is insufficient for a retaliation claim." Smith v. Miller, No. 15-CV-9561, 2017 WL 4838322, at *7 (S.D.N.Y. Oct. 23, 2017) (quoting Walker v. Schriro, No. 11-CV-9299, 2013 WL 1234930, at *8 (S.D.N.Y. Mar. 26, 2013)). Because Martin and Pratt were not the subjects of Plaintiffs' discrimination complaints, Plaintiffs' retaliation claim must, at the very least, provide evidence establishing that Martin and Pratt "have personal knowledge of the [discrimination complaints] that purportedly motivated the retaliatory conduct." Id.

Pratt and Martin both testified that they were unaware of Plaintiffs' discrimination complaints. Martin Tr. at 77–78; Pratt Tr. at 73–74. Plaintiffs do not provide evidence creating a genuine dispute of fact regarding Pratt and Martin's lack of knowledge. First, Plaintiffs observe that "Pratt interacted with [Jaclyn] at times she visited." RSMF ¶ 51 (citing Pratt Tr. at 74–76). However, Pratt states that her interactions with Jaclyn were limited to processing Jaclyn into the

24

Visiting Room, and occasionally "send[ing Jaclyn] out to change" into Visiting Room-appropriate clothing. Pratt Tr. at 9–10, 14. This is not evidence that Pratt knew of Plaintiffs' complaints, nor do such limited interactions create an inference that Pratt may have known of Plaintiffs' complaints. Second, regarding Martin's knowledge, Plaintiffs state that "Martin as a [correctional officer] is legally bound and obligated to know of [Anthony's] existence as an inmate in his care, custody, and control." RSMF ¶ 53. Regardless of whether Martin was "obligated" to have knowledge of Anthony's "existence," this does not establish that Martin *actually* knew of Anthony's *complaints*. Third, Anthony's statement that Martin learned about Plaintiffs' complaints during "daily briefings" at Cape Vincent C.F, A. Stone Tr. at 83–84, is wholly speculative because Anthony admitted that he merely "assume[d]" that these briefings exist, that Martin attended them, and that Plaintiffs' complaints were discussed at these briefings, id. at 83–86.

Plaintiffs, apparently acknowledging the lack of evidence establishing Martin and Pratt's knowledge of their discrimination complaints, state that "the circumstances evidence knowledge of the protected activities." Resp. at 16 (citing Cover v. Potter, No. 05-CV-7039, 2008 WL 4093043, at *3 (S.D.N.Y. Aug. 29, 2008)). However, Plaintiffs follow this statement only by citing evidence showing that Graves and Jones knew of Plaintiffs' discrimination complaints. Resp. at 17. Without evidence suggesting that Graves or Jones did something to make Pratt and Martin aware of the complaints, evidence of Graves and Jones's knowledge does not establish Martin or Pratt's knowledge.

Finally, Plaintiffs state that they are "only required to show that the defendants had general corporate knowledge of the protected activity." Resp. at 16 (quoting Gordon v. New

York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000)). As with their "hostile environment" argument in the discrimination section, Plaintiffs support this argument solely by citing numerous Title VII opinions that discuss retaliation in the employment context. Id. at 16–17. Plaintiffs cite no authority to suggest that the general corporate knowledge doctrine has been applied in the prison retaliation context. In fact, such an application would run afoul of the precedent, discussed above, requiring an inmate to provide evidence of a defendant's knowledge of the inmate's complaint when the defendant was not named in the complaint.

Because Plaintiffs provide no evidence establishing Martin or Pratt's knowledge of their discrimination complaints, they fail to create a triable question of fact regarding causation. Accordingly, the retaliation claims against Martin and Pratt do not survive summary judgment. See Tirado v. Shutt, No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his . . . grievance, [plaintiff] has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not named."); Henson v. Gagnon, No. 13-CV-590, 2015 WL 9809874, at *12 (N.D.N.Y. Dec. 10, 2015) (finding no evidence of causal connection where "[t]here is no evidence disputing [defendant's] statement that he was unaware of grievances previously filed by [p]laintiff prior to conducting the cell search . . ., and therefore was in no way influenced by such grievances in conducting the search or filing the Misbehavior Report").

### 3. Graves

Plaintiffs support their retaliation claim against Graves by pointing to numerous comments that he made after the cube search was conducted. Resp. at 17. According to Jaclyn, on December 16, 2012, Graves told her, "I don't do well with people that accuse my officers of

26

things they don't do." J. Stone Tr. at 191. Jaclyn responded, "I don't do well with officers that set
my husband up just because we're an interracial couple," and Graves said, "That's how we do
things around here." Id. at 192. Additionally, when Graves interviewed Anthony after he accused
Martin and Pratt of planting contraband in his cube, Graves told him that he "brought too much
attention to [himself]." A. Stone Tr. at 80. The Court assumes that Plaintiffs intend these
statements to serve as evidence that Graves participated in the planting of drugs, which they
contend was "an orchestrated 'setup.'" Resp. at 17–18.

Unlike Martin or Pratt, there is a factual dispute regarding Graves' knowledge of
Plaintiffs' complaints on the day that Anthony was accused of possessing drugs. Compare Knapp
Tr. at 41 (stating that Knapp asked Graves to observe Plaintiffs in the visiting room as part of his
investigation into their complaints), with Graves Tr. at 29 (testifying that he did not know that
Anthony had filed complaints and that he did not know the nature of Jaclyn's complaints).
However, Plaintiffs present no evidence that plausibly suggests that Graves was involved in the
alleged decision to plant drugs in his cube. Mustizer, not Graves, authorized the search of
Anthony's cube after finding a written tip. SMF ¶ 45. Plaintiffs' assertion, without the support of
relevant evidence, that "the alleged discovery of [the tip] was really part of an orchestrated
'setup'," RSMF ¶ 45, is unsubstantiated. Moreover, Plaintiffs do not provide evidence suggesting
that Graves directed or encouraged Mustizer to authorize the search. In fact, they do not even
allege that this may have happened. Moreover, there is no evidence suggesting that Graves may
have directed or encouraged Martin and Pratt to plant drugs in Anthony's cube. Again, Plaintiffs
do not even allege that Graves did so.

27

The statements attributed to Graves in the days after December 11 are similarly unavailing. If these statements occurred *before* Martin and Pratt searched Anthony's cube, or if they were supplemented by any evidence indicating that Graves played a role in a decision to place amphetamines in Anthony's cube, the statements could be seen as admissions by Graves that he helped frame Anthony for possessing drugs. However, because the statements took place *after* Martin and Pratt searched Anthony's cube, the statements are, at best, affirmations that retaliation is not uncommon at Cape Vincent C.F. and that Graves was upset that Plaintiffs filed discrimination complaints. These comments are insufficient to establish that Graves, as part of a conspiratorial "setup," helped frame Anthony. Accordingly, Plaintiffs' retaliation claim against him cannot survive summary judgment. See Faulk v. Fisher, 545 F. App'x 56, 59 (2d Cir. 2013) (affirming grant of summary judgment against plaintiff's retaliation claim where defendant corrections counselor "commented on his successful grievance and warned him against filing more[,] but . . . neither initiated nor authorized the two challenged misbehavior reports"); see also Crenshaw v. Herbert, 445 F. Supp. 2d 301, 305 (W.D.N.Y. 2006) (granting summary judgment against plaintiff's retaliation claim because "plaintiff offer[ed] nothing more than speculation that the moving defendants did what they did because he had filed a grievance").

4. *Jones*

During Anthony's interview with Jones on December 11, 2012, regarding Anthony's discrimination complaint, Anthony allegedly stated that he was worried the officers named in the complaint "would plant a weapon on [him]" to retaliate against him for filing a grievance. A. Stone Tr. at 74. He states that Jones tape recorded the conversation. Id. at 73. Before the disciplinary hearing relating to Anthony's possession of amphetamines, he allegedly asked Jones

28

for the tape recording, and Jones denied recording the conversation. Id. Anthony contends that Jones's alleged withholding of the tape recorder constituted retaliation because it "assist[ed] in the cover-up" of Martin and Pratt's alleged retaliation. Id. at 76–77. Jones, like Graves, did not authorize or plan the search of Anthony's cube. Moreover, he did not "cover up" any retaliation because the Court already dismissed the retaliation claim against Martin and Pratt. Accordingly, the retaliation claim against Jones must be dismissed.

### D.  Section 1981 Retaliation Claims

Plaintiffs further allege that Defendants retaliated against them in violation of § 1981. SAC ¶¶ 67–69. Like with First Amendment retaliation claims, plaintiffs alleging a § 1981 retaliation claim must establish that their protected activity caused the adverse action taken against them. Cook v. CBS, Inc., 47 F. App'x 594, 596 (2d Cir. 2002). Because Plaintiffs' First Amendment claims failed because of lack of causation, their § 1981 retaliation claims must also be dismissed for failing to establish causation. See Howard v. City of New York, 602 F. App'x 545, 548 n.2 (2d Cir. 2001) (holding that district court did not err by failing to analyze "§ 1981 and First Amendment retaliation claims independently" because the "1981 claim [like the First Amendment claim] would fail for lack of causation even if analyzed independently").

### E.  Due Process

In his due process claim, Anthony alleges that he was denied procedural protections at the disciplinary hearing regarding his alleged possession of amphetamines. Resp. at 18. Specifically, he argues that Jones's alleged withholding of the tape recording of their interview deprived him

of due process.[7] Id. As a result of the possession charge against Anthony and the adverse decision at his hearing, he was confined to SHU for ninety days. See Ex. A.

A plaintiff has "'no right to due process [at his hearing] *unless* a liberty interest' was infringed as a result." Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004) (quoting Scott v. Albury, 156 F.3d 283, 287 (2d Cir. 1998) (alteration in original)). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Id. (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)) (alteration in original). The Court must consider both the duration and the conditions of SHU confinement to determine whether it poses an atypical and significant hardship. Id. "[R]estrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and to be actionable require proof of conditions more onerous than usual." Rivers v. Paige, No. 12-CV-6593, 2014 WL 897094, at *2 (W.D.N.Y. Mar. 6, 2014) (citing Colon v. Howard, 215 F.3d 227, 231–32 (2d Cir. 2000)).

Here, Anthony was confined in SHU for only ninety days. He does not allege that the conditions he endured were different from normal. Furthermore, no record evidence supports an inference that Anthony endured atypically severe conditions during his SHU confinement. Because Anthony's confinement was for a period of fewer than 101 days and he did not endure "conditions more onerous than usual," he was not entitled to due process protections at his

---

[7] Anthony's due process claim also contains allegations against Hearing Officer John Doe, SAC ¶ 40, but, as noted above, these allegations have already been dismissed.

30

hearing. Therefore, the Court grants Defendants' Motion for summary judgment with respect to the due process claims against Jones.

**F.  Title VI**

Plaintiffs allege a Title VI claim against DOCCS, arguing that DOCCS was deliberately indifferent to the racial discrimination that they allegedly faced in the Visiting Room. SAC ¶¶ 83–86; Resp. at 12. "Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 664 (2d Cir. 2012). "[T]his includes prohibition of intentional discrimination." T.E. v. Pine Bush Cent. Sch. Dist., 58 F. Supp. 3d 332, 355 (S.D.N.Y. 2014) (citing Alexander v. Sandoval, 532 U.S. 275, 280–81 (2001)). In some situations, "the deliberate indifference of third parties to discrimination" may constitute "a violation of Title VI by the recipient." Id. The funding recipient is only liable under Title VI for exhibiting deliberate indifference to "harassment [that is] severe, pervasive, and objectively offensive and discriminatory in effect." Zeno, 702 F.3d at 665 (internal quotation marks omitted). Plaintiffs can establish DOCCS' deliberate indifference to discriminatory harassment by providing evidence that shows a "failure to respond, a response that only follows after a lengthy and unjustified delay," id. at 362, or a response that "is clearly unreasonable in light of the known circumstances," TC v. Valley Cent. Sch. Dist., 777 F. Supp. 2d 577, 596 (S.D.N.Y. 2011).[8]

---

[8]  The Court can find no authority to suggest that the deliberate indifference standard described in this section applies to a correctional facility's failure to respond to discriminatory harassment against inmates. The case law discussing this standard appears limited to situations involving harassment of a student in schools or school districts receiving federal funding. E.g., Zeno, 702 F.3d at 665 ("[I]n the educational setting, a school district is liable [under Title VI] . . . when it has been 'deliberately indifferent' to . . . harassment of a student."); Thompson v. Ohio State Univ., 639 F. App'x 333, 342 (6th Cir. 2016) ("Other circuits have . . . held that a

Here, Plaintiffs assert "that no real investigation was conducted [into their discrimination complaints] and therefore no corrective or remedial action was taken whatsoever." Resp. at 7. Of the events described in the Visiting Room, only the October 27, 2012, incident where Black allegedly berated Anthony using racial slurs could be considered "objectively offensive" racial harassment for the purpose of a deliberate indifference claim. See DiStiso v. Cook, 691 F.3d 226, 242–43 (2d Cir. 2012) ("[U]se of the reviled epithet 'nigger[]' raises a question of severe harassment going beyond simple teasing and name-calling."). After reviewing the record, the Court finds that Cape Vincent C.F. staff promptly investigated this incident in a manner that cannot be considered unreasonable.

Staveckis, at Knapp's direction, Knapp Tr. at 35, interviewed Anthony around a day after Jaclyn called Cape Vincent C.F. to complain about the October 27 incident with Black, SMF ¶ 33. Despite Plaintiffs' unsubstantiated assertion that Staveckis's interview was merely "an

---

school can be liable for deliberate indifference to racial harassment under Title VI, noting that Title IX [which permits liability for a school's deliberate indifference to sexual harassment] was based on Title VI."); Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 293 (3d Cir. 2014) (applying the Title VI deliberate indifference standard to analyze a school district's response to alleged racial harassment); Oliveras v. Saranac Lake Cent. Sch. Dist., No. 11-CV-1110, 2014 WL 1311811, at *14 (N.D.N.Y. Mar. 31, 2014) (same).

Although the Court is not convinced that Plaintiffs can state a Title VI deliberate indifference claim in this action, it previously held that they may, Mar. 2016 Order, and both parties' briefs apply the standard described in this section, Mem. at 23–26; Resp. at 7–12. "The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" New York City Dep't of Fin. v. Twin Rivers, Inc., No. 95-CV-1389, 1997 WL 299423, at *1 (S.D.N.Y. June 5, 1997) (quoting DiLaura v. Power Auth., 982 F.2d 73, 76 (2d Cir. 1992)). While "[c]ourts generally depart from the law of the case . . . to correct a clear error or prevent manifest injustice," id. at *2, the law of the case "doctrine 'is admittedly discretionary'," id. at *1 (quoting Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)). As will be discussed, Plaintiffs provide insufficient evidence to establish deliberate indifference under the standard described in this section. Therefore, the Court's analysis of this claim will not cause manifest injustice, and it exercises its discretion not to depart from the law of the case.

attempt to intimidate" Anthony, Resp. at 11, the record shows that Staveckis asked Anthony

whether "someone was swearing or using racial language" in the Visiting Room, and whether

Anthony could provide the names of any witnesses who could corroborate Plaintiffs' version of

events, Ex. G. Anthony refused to answer either of these questions. Id. Moreover, following an

interview with Staveckis, Black wrote a memo dated November 2, 2012,[9] where he denied the

allegations that Plaintiffs leveled against him. Ex. H.

On December 6, 2012, DOCCS initiated a second round of investigations into Plaintiffs'

Visiting Room complaints after receiving a written grievance that Anthony sent on October 28.

SMF ¶ 40. DOCCS "directed Cape Vincent [C.F.] Superintendent Patricia LeConey to conduct

an investigation" regarding the complaint's allegations. SMF ¶ 41. On December 11, Jones

interviewed Anthony as part of this investigation, and Anthony informed Jones that "since

[October 27] the 'regular' visit room officers have been working" and neither Plaintiff had

experienced problems in the Visiting Room since that time. Ex. M. Jones believed that, because

Plaintiffs were no longer being harassed in the Visiting Room when he interviewed Anthony,

"the matter [was] disposed of." Jones Tr. at 12–13. On December 21, 2012, DOCCS Deputy

Commissioner Joseph Bellnier sent Anthony a letter informing him that the investigation into his

complaints was complete and that DOCCS deemed his allegations unsubstantiated. Ex. Z.

---

[9] Plaintiffs observe that Staveckis's October 30 memo, which discusses his interview
with Anthony, references Black's memo. Resp. at 11; see also Ex. G. Plaintiffs then argue that,
because Black's memo was dated November 2, 2012, "there is a question of fact whether Black
was even interviewed." Resp. at 11; see also Ex. H. The Court disagrees. At most, this
observation casts doubt on the dates that either Staveckis's or Black's memos were authored,
which does not alter the Court's analysis of Plaintiffs' deliberate indifference claim.

The Court finds, after reviewing the record, that the investigations into Plaintiffs' complaints against Black were initiated promptly and conducted thoroughly. Moreover, given the lack of information provided by Anthony during his interviews, the admitted absence of a persistent discrimination problem, and the memo from Black denying the allegations against him, DOCCS's decision not to sanction Black cannot be considered unreasonable. See DT v. Somers Cent. Sch. Dist., 588 F. Supp. 2d 485, 497 (S.D.N.Y. 2008) ("Given the undisputed facts that defendants engaged in some forms of investigation into the [complained-of harassment], even though plaintiffs may have been dissatisfied with the outcome, and the fact that [one plaintiff] was never again subjected to harassment by [his peers], this Court finds that defendants' response was not so deliberately indifferent as to be clearly unreasonable."); Barmore v. Aidala, No. 04-CV-445, 2006 WL 1978449, at *8 (N.D.N.Y. July 12, 2006) (stating that defendants were not deliberately indifferent for purposes of "racially hostile educational environment" claim because "each time [p]laintiff brought his complaints . . . to the attention of school administrators, an investigation was conducted," even though [p]laintiff may not have like[d] the results that were reached"). For these reasons, the Court grants Defendants' Motion for summary judgment with respect to Plaintiffs' Title VI claims against DOCCS.

### G.  New York State Constitution

Plaintiffs allege that Defendants' conduct violated Article I of the New York State Constitution. SAC ¶¶ 80–82. "The basic statutory grants of federal-court subject-matter jurisdiction are contained in 28 U.S.C. §§ 1331 and 1332. Section 1331 provides for '[f]ederal-question' jurisdiction, § 1332 for '[d]iversity of citizenship' jurisdiction." Arbaugh v. Y&H Corp., 126 S.Ct. 1235, 1244 (2006) (quoting §§ 1331–32). When a federal court has subject

matter jurisdiction over claims in an action, it may exercise supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims because it has already dismissed every claim over which it has subject matter jurisdiction. See § 1367(c) (providing that a "district court[] may decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction"). The Court, therefore, grants Defendants' Motion for summary judgment with respect to Plaintiffs' state law cause of action.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion for summary judgment (Dkt. No. 105) is **GRANTED**, and the case is **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this case; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      January19, 2018
            Albany, New York

Lawrence E. Kahn
U.S. District Judge

35